**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 19 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LYN SWONGER and JAMES
SPAULDING, individually, and on behalf
of all other similarly situated former Rock
Island and St. Louis Southwestern
Railway Company Trainmen and
Members of the United Transportation
Union; DOYLE BOYD; RICHARD
HITZ; DAVE BODENHAMER; DENNIS
SWIANTEK; RONNIE KESSLER;
RICHARD HELSEL; CURTIS
RANDOLPH; RICK HOLLAND;
PHILLIP BRUNOW; CHARLES
KIZZIRE; KENNETH ALDRICH;
RANDALL BROWN; JIM CROWDER;
RICHARD HUMBLE; LOREN
BETTLES; GARY POLK; F.A.
CALLAWAY; T.E. LEATHERMAN,
individually,

      Petitioners,

v.

SURFACE TRANSPORTATION
BOARD and UNITED STATES OF
AMERICA,

      Respondents,

No. 00-9518

---

UNITED TRANSPORTATION UNION
("UTU"); WAYNE A. DAY; JOHN S.
HOFFMAN; CLAYTON MILLS;
UNION PACIFIC RAILROAD

COMPANY,

        Intervenors.

---

## ON PETITION FOR REVIEW OF A DECISION OF
## THE SURFACE TRANSPORTATION BOARD
### (STB Finance Docket No. 32760 (Sub-No. 33))

---

Bruce H. Stoltze, Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, P.C., Des Moines, Iowa, for Petitioners.

Marilyn R. Levitt, Attorney, (Ellen D. Hanson, General Counsel, Craig M. Yeats, Deputy General Counsel, and Louis Mackall, V, Attorney, with her on the brief), Washington, D.C., for Respondent Surface Transportation Board.

Brenda J. Council, Kutak Rock LLP, Omaha, Nebraska, for Respondent-Intervenor Union Pacific Railroad Company.

Joseph A. Guerrieri, Jr. and John A. Edmond, Guerrieri, Edmond & Clayman, P.C., Washington, D.C., filed a brief on behalf of Respondent-Intervenor United Transportation Union.

---

Before **EBEL**, **MCKAY**, and **CUDAHY**[*], Circuit Judges.

---

**CUDAHY**, Circuit Judge.

---

The petitioners appeal a ruling of the Surface Transportation Board (STB) refusing to review an arbitrator's decision to approve certain changes in the seniority status of the

---

[*]The Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation.

2

petitioners and in the relocation of their home terminal. The changes were included in an agreement negotiated between the Union Pacific Railroad Company and the United Transportation Union (UTU). This agreement implemented the consolidation of operations and workforces of the Union Pacific and its affiliates with the Southern Pacific Transportation Company and its affiliates, including the St. Louis Southwestern Railway (SSW). In addition to the STB, the Union Pacific and the UTU have filed briefs as intervenors in support of the ruling. For the reasons set forth below, we affirm the decision of the STB declining to overturn the arbitrator's decision.

## I.

Congress has enacted laws to encourage the consolidation of railroad operations, including 49 U.S.C. § 11321. Part (a) of that section exempts those participating in a transaction consolidating railroad operations from "antitrust laws and from all other law . . . as necessary to let that [carrier, corporation, or person] carry out the transaction." With that exemption comes a limitation: 49 U.S.C. § 11326 requires carriers participating in such a transaction to provide a "fair arrangement" for their employees. *See Railway Labor Executives' Ass'n v. United States*, 987 F.2d 806, 813 (D.C. Cir. 1993) (*RLEA*). Section 11326 incorporates the protections of the Rail Passenger Service Act. 45 U.S.C. § 565, which provides that, in transactions approved by the Interstate Commerce

Commission (ICC) (now transmogrified into the STB),[1] "protective arrangements shall include . . . such provisions as may be necessary for . . . the preservation of rights, privileges, and benefits . . . under existing collective bargaining agreements . . . ."

The petitioners here were hired originally by the Rock Island and Pacific Railroad Company to work on its Tucumcari line. In 1980, after the Rock Island went bankrupt,[2] SSW purchased part of that railroad, including the Tucumcari line.[3] The SSW and several other railroads that had purchased parts of the Rock Island entered into an agreement with certain relevant labor unions providing for the preferential hiring of former Rock Island employees. This agreement, however, did not give these employees full carryover seniority,[4] and the former Rock Island employees brought a class action

---

[1]Section 204 of the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995), transferred the ICC's railroad-related functions to the STB and directed that the STB apply ICC precedent.

[2]The Rock Island sought to reorganize in 1975 under the Bankruptcy Act. The plan for reorganization was rejected in 1980 by the bankruptcy court, and the court recommended that the trustee assigned to the matter commence liquidation. *See In re Rock Island*, No. 75 B 2697, Order No. 232 (N.D. Ill. 1980).

[3]The ICC approved that acquisition in *SSW-Purchase-Rock Island*, 363 I.C.C. 320 (1980).

[4]When two seniority systems are dovetailed with one another in a railroad combination, employees of the acquired line receive "carryover" seniority rights. This means that these employees may carry over in full their seniority rights from their old employer to their new one. However, it is sometimes necessary that "acquired employees" carry over only a part of their seniority rights. *See Volkman v. UTU*, 724 F.Supp. 1282, 1288 (D. Kan. 1989), *rev'd on other grounds*, 73 F.3d 1047 (10th Cir. 1996).

lawsuit against the SSW and the UTU raising the carryover issue. *See Volkman v. UTU*, 724 F.Supp. 1282 (D. Kan. 1989), *rev'd on other grounds*, 73 F.3d 1047 (10th Cir. 1996). The *Volkman* court held that the former Rock Island employees were not entitled to full carryover seniority, and instead, that their seniority date was established as their date of hire by the SSW. The court also held that the former Rock Island employees were entitled to "prior rights," which gave them preference over other SSW employees at the location where they were first hired by the SSW.

The present litigation arises out of a merger that again affected the petitioners' rights. In August 1996, the STB approved the merger of the Union Pacific and the Southern Pacific, with the Union Pacific as the surviving rail carrier. *See Union Pacific/Southern Pacific Merger*, 1 S.T.B. 233 (1996), *aff'd sub nom. Western Coal Traffic League v. STB*, 169 F.3d 775 (D.C. Cir. 1999).[5] When the STB first approved this transaction, it imposed on the merger certain employee protective provisions. Earlier, in *New York Dock Ry.-Control-Brooklyn E. Dist.*, 360 I.C.C. 60, 84, 90 (1979), *aff'd sub nom. New York Dock Ry. v. United States*, 609 F.2d 83 (2d Cir. 1979), the ICC had imposed a set of conditions and procedures on merging railroads to allow them to meet their obligations under § 11347 (now § 11326). Those conditions require the negotiation,

_____

[5]In order for railroads to merge their operations, they must first obtain regulatory approval from the STB. 49 U.S.C. § 11323-26. The STB will approve a proposed merger or consolidation only if it finds that the transaction is in the public interest. *See* 49 U.S.C. § 11324(c); *see also Norfolk & W. Ry. Co. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 132 (1991).

and, if necessary, arbitration of agreements with labor organizations representing employees affected by a consolidation, merger or acquisition for the purpose of implementing operational changes.[6]  In accordance with Article I, Section 4 of the *New York Dock* conditions, which provides that railroads must negotiate with employees over any proposed rearrangement or displacement of personnel, the Union Pacific negotiated with the UTU over its plan to change contractual seniority policies and place the employees of the merged railroads under a single collective bargaining agreement.[7] Under the negotiated operating plan for the merger, the Union Pacific announced its intention to use a so-called "hub and spoke" system.  Pursuant to that plan, the Union Pacific decided to create a "Salina hub" and, in that connection, to move petitioners' home terminal from Pratt, Kansas to Herington, Kansas.[8]  Employees of the merged railroads were to be dovetailed into the seniority list based on their date of hire at the property at which they were last employed.  Thus, all names on the previously separate seniority rosters would be listed on a single roster in order of seniority.  *See Volkman*, 724

---

[6]*New York Dock* also requires the payment of certain "displacement allowances" to employees who are placed in a worse position with respect to compensation and rules governing their working conditions, *see* art. I, sections 1, 5, as well as "dismissal allowances" to employees who are deprived of employment as a result of a railroad transaction, s*ee* art. I, sections 1, 6.  These benefits are available during a "protective period," which lasts for six years following displacement or dismissal.  *See* art. I.

[7]The UTU is the labor union that represented the petitioners in the negotiations leading to the agreement, as well as other affected employees.

[8]Locating the "home terminal" at Herington meant that crews would be based in Herington.

F.Supp. at 1288.

Following the principle of the *Volkman* litigation, under the present agreement, the petitioners' seniority would continue to be determined by their dates of hire by the SSW. However, the prior rights that they had previously exercised with respect to other SSW employees would be eliminated. There was, however, objection to this elimination of prior rights. Exercising prerogatives under the UTU Constitution, a designated union officer voiced dissatisfaction with the loss of prior rights and thereby torpedoed the agreement.[9] If parties to *New York Dock* negotiations cannot reach an agreement voluntarily, the matter in dispute must be submitted to mandatory binding arbitration. *See New York Dock*, 360 I.C.C. at 85. This procedure was followed and the arbitrator found the tentative agreement to be fair, and approved it. The petitioners then sought review of the arbitral award by the STB. That body examines arbitration decisions under a rather lenient standard of review. *See Chicago & N.W. Transp. Co.—Abandonment—Near Dubuque & Oelwein, Ia.*, 3 I.C.C.2d 729, 735-36 (1987) (*Lace Curtain*), *aff'd sub nom. IBEW*, *now codified at* 49 C.F.R. § 1115.8 (1999). In this case, the STB declined to review the arbitrator's decision, noting that the decision turned on the arbitrator's factual findings, which, according to the STB, deserved deference absent some egregious error.

---

[9]Under the UTU Constitution, the agreement could not be ratified without approval of all general chairpersons in the affected jurisdictions. The officer who objected to the agreement was the UTU associate general chairperson representing the former SSW employees.

*See Lace Curtain*, 3 I.C.C.2d at 735.[10] The petitioners appeal that decision as a final

order of the STB pursuant to 28 U.S.C. §§ 2321(a), 2342(5), 2343 and 2344.

As indicated, under the *Lace Curtain* standard, the STB declined to upset the

arbitrator's decision. Under *Lace Curtain*, the agency's (then the ICC's) review was

limited: it inquired whether an award was "procedurally fair and impartial," and would

not vacate awards on substantive grounds "unless there is egregious error, the award fails

to draw its essence from the collective bargaining agreement, or the arbitrator exceeds the

specific contract limits on his authority." *Lace Curtain*, 3 I.C.C.2d at 735. Moreover, the

agency (now the STB) limits its more detailed review of arbitrators' decisions to

"recurring or otherwise significant issues of general importance regarding the

interpretation of [its] labor protection conditions." *Id.* at 736. If the STB declines to

review an arbitrator's decision, that action may not be set aside unless it is arbitrary,

capricious, an abuse of discretion or otherwise not in accordance with the law. *See* 5

U.S.C. § 706(2)(a); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 42-44 (1983). The STB's interpretation of labor protective conditions (e.g., the

*New York Dock* conditions ensuring railroad compliance with § 11326) is entitled to

deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837,

---

[10]The language used in the STB decision and the briefs filed by the parties refers to the STB's action as "declin[ing] to review" the arbitrator's decision. This is equivalent to accepting, in the absence of a showing of egregious error, the arbitrator's findings of fact and related conclusions. "Review" is used interchangeably with "overturn" in all the parties' pleadings. We will treat it similarly.

8

842-43 (1984). Under *Chevron*, we are generally required to defer to the agency's determination if "it is based on a permissible construction of the statute." *Id.* at 843. More specifically, if we find "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," we must accept the agency's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843-44. And the D.C. Circuit has observed that "courts owe even greater deference to agency interpretations of agency rules than . . . to agency interpretations of ambiguous statutory terms." *Consolidated Rail Corp. v. ICC*, 43 F.3d 1528, 1532 (D.C. Cir. 1995) (internal quotations and citations omitted).

## II.

Under article I, section 2 of the *New York Dock* conditions, certain employee privileges may not be abrogated by the STB. 360 I.C.C. at 84. Section 2 mandates that the "rates of pay, rules, working conditions and all collective bargaining and other rights, privileges, and benefits . . . under applicable laws and/or existing collective bargaining agreements shall be preserved unless changed by future collective bargaining agreements." *Id*. The petitioners argue that, under section 2, the arbitrator here was without authority to approve a settlement that modified their seniority rights because, they argue, seniority rights are "rights, privileges, and benefits."

Whether seniority rights are "rights, privileges, and benefits" is a question of first impression in the Tenth Circuit. However, the ICC and the D.C. Circuit have addressed

9

the issue—quite persuasively.

In *CSX Corp.—Control—Chessie Sys., Inc. & Seaboard Coast Line Indus., Inc. (Arbitration Review)* Finance Docket No. 28905 (Sub-No. 27) (Nov. 22, 1995), the ICC held that seniority provisions did not fall under the rubric of protected "rights, privileges, and benefits." *Id*. The ICC defined those "rights, privileges, and benefits" that are absolutely protected from abrogation as constituting "the incidents of employment, ancillary emoluments or fringe benefits . . . ." *Id.* (quoted in *UTU v. STB*, 108 F.3d 1425, 1430 (D.C. Cir. 1997). These included, for example, life insurance, medical care, sick leave and vested and accrued benefits to which employees were entitled. The D.C. Circuit, in reviewing the ICC decision, found that conclusion to be reasonable. *See UTU*, 108 F.3d at 1429-30. The court reasoned that the classification reflected congressional intent:

> Under the Commission's interpretation, 'rights, privileges and benefits' are protected absolutely, while other employee interests that are not inviolate are protected by a test of 'necessity,' pursuant to which there must be a showing of a nexus between the changes sought and the effectuation of an ICC-approved transaction. Under this scheme, the public interest in effectuating approved consolidations is ensured without any undue sacrifice of employee interests. In our view, this is exactly what was intended by Congress.

108 F.3d at 1430. In justification of this distinction, the court accepted the ICC's assertion that a requirement of collective bargaining over seniority provisions would frustrate railroad merger transactions. *See id*. The court approved the ICC's reasoning that seniority provisions "have consistently been modified in the past in connection within

[sic] consolidations. This may be due to the fact that almost all consolidations require scope and seniority changes in order to effectuate the purpose of the transaction. Railway Labor Act bargaining over these aspects of a consolidation would frustrate the transactions." *See UTU*, 108 F.23d at 1430 (quoting *CSX Corp.* at 15).

The Supreme Court explicitly recognized the possibility of adjusting collectively bargained terms in *Norfolk*, 499 U.S. at 132-33. 49 U.S.C. § 11341(a) (now § 11321(a)) provides that, in railroad transactions, participants are "exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let [them] carry out the transaction . . . ." In *Norfolk*, the Court held that the exemption from "all other law" includes the obligations under a collective bargaining agreement; thus, the ICC (now the STB) may override such obligations if necessary to approve a transaction. *See id.* at 127-28.

We agree that the STB's interpretation of the statute is reasonable. It is not manifestly arbitrary or capricious, and it carries out Congress' intent. Congress enacted laws to encourage railroad consolidations while imposing protective requirements to ensure that affected employees' interests be accommodated within reason. Without abrogating some rights, railroad consolidations would be difficult to achieve; that is why there are such extensive safeguards in place to accommodate employee interests. Specific seniority rights are individual rights that necessarily must be modified in some manner in most railroad consolidations; they stand in contrast to certain unmodifiable rights of

11

labor—rights of the employees as a whole, as to which there usually a uniform union position—which require collective bargaining to be changed. For this reason, we find that the STB's interpretation is reasonable, and we conclude that seniority rights are not "rights, privileges, and benefits" within the meaning of the *New York Dock* conditions. Seniority rights could therefore properly be modified here by the arbitration award, provided that modification was necessary to carry out the merger.

### III.

As indicated, a showing of "necessity" is required for the modification of seniority rights. *See* 49 U.S.C. §§ 11321(a) and 11326. The petitioners argue that there was no necessity here, and that therefore STB erred in approving the seniority modifications by concluding that they promoted transportation benefits associated with the merger. But the petitioners' assignment of error to the STB and to the arbitrator stems from a misconception of what is required to show necessity. The STB argues that, to justify a finding of necessity, one need only find 1) a nexus between the changes sought and the effectuation of the transaction, *see UTU*, 108 F.3d at 1430, and 2) real transportation benefits resulting from the underlying transaction, *see RLEA*, 987 F.2d at 815.

We agree that the necessity standard does not require a finding by the arbitrator and the STB that the merger could not be effectuated without the specific changes that are proposed for the petitioners' seniority rights and for the designation of their home

12

terminal.[11]  First, as has been noted, seniority rights must almost always be adjusted to implement any merger.  The D.C. Circuit recognized this problem and has required only that "the work transfer was 'necessary' for it yielded transportation efficiencies and was not aimed solely at abrogating a CBA provision."  *ATDA*, 26 F.3d at 1165.  As the D.C. Circuit has observed:

> [T]here is little point in consolidating railroads on paper if a consolidation of operations cannot be achieved.  It is obvious that separate and distinct parts, operating separately and distinctly, will not generate the value of the consolidation . . . . Improvements in efficiency generated by a consolidated seniority roster will reduce . . . cost of service, resulting in reduced costs to shippers and ultimately customers.

*UTU*, 108 F.3d at 1431.

The Supreme Court has also recognized the circumstances in which adjustments need to be made.  It has held that the ICC (now the STB) may abrogate some terms of collective bargaining agreements affecting transactions if abrogation is necessary to effectuate them.  *See Norfolk*, 499 U.S. at 127-28.  This principle has been interpreted to mean that "the modification is necessary in order to secure to the public some transportation benefit flowing from the underlying transaction . . . ."  *RLEA*, 987 F.2d at 815.  The D.C. Circuit has explained this requirement:

> [T]he [agency] must find that the underlying transaction yields a transportation

---

[11]Under the "hub and spoke" plan for implementation of the merger, the number of home terminals was to be reduced.  The negotiating parties reasoned that the location of the home terminal in Herington, rather than Pratt, was the most efficient way of implementing the plan.

13

benefit to the public, "not merely [a] transfer [of] wealth from employees to their employer." [*RLEA*,] 987 F.2d at 815. In other words, the benefit cannot arise from the CBA modification itself; considered independently of the CBA, the transaction must yield enhanced efficiency, greater safety, or some other gain.

*American Train Dispatchers Ass'n v. ICC*, 26 F.3d 1157, 1164 (D.C. Cir. 1994) (*ATDA*), *abrogated on other grounds*, *Rio Grande Pipeline Co. v. Federal Energy Regulatory Comm'n*, 178 F.3d 533 (D.C. Cir. 1999). Further, there must be "a nexus between the changes sought and the effectuation of an [agency-]approved transaction." *UTU*, 108 F.3d at 1430.

In this case, the arbitrator, in determining whether there was a public transportation benefit requiring the modification of seniority status, stated that he was "convinced that the successful implementation of the 'hub and spoke' operation at Salina is an obvious public transportation benefit and that considerations of efficiency of that operation warrant the modification and elimination of existing seniority rights as set forth in the proposed implementing agreement." Arbitration at 5. The arbitrator further found that the agreement "fairly and equitably blends the rights of the petitioners with those of other affected employees." *Id.* at 7. This was insufficient, the petitioners contend, either to satisfy the requirement that the modifications are necessary or to constitute a factual finding warranting deferential review by the STB.

The petitioners argue that the necessity requirement mandates that the STB and the arbitrator set forth sufficient facts to disclose the basis on which the finding of necessity was made. Thus, the petitioners argue that the case should be remanded for such specific

14

findings. But they cite no authority imposing a requirement of greater specificity than is apparent here. The arbitrator explained the reason for his decision, and the STB does not review an arbitrator's factual determinations absent egregious error. To some extent, the existence of necessity is bolstered by procedural factors: the arbitrator held a full hearing and weighed the written and oral submissions of the parties. Absent clear error, the lack of a more detailed articulation of reasons is not enough to warrant disapproval by the STB under its lenient standard of review (although by so holding we do not intend to derogate the importance of an adequate statement of reasons). Under the *Lace Curtain* standard of review, fact-bound determinations such as the ones before us may not be overturned without a showing of egregious error. *See Lace Curtain*, 3 I.C.C.2d at 735; *see also ATDA*, 26 F.3d at 1163.

Finally, the STB concluded (and we agree) that *Volkman* supports the use of the petitioners' SSW hire date to determine their seniority status, because it was *Volkman* that first set the petitioners' hire date at the date of their hire by the SSW.[12]

---

[12]The "prior rights" of which the petitioners in this case have been deprived—first preference to jobs at the location where they were first hired by the SSW—were not deemed inviolate by the *Volkman* court. The court noted that these "prior rights" were "subject to modification through future collective bargaining the same as are prior rights granted under existing labor contracts between the defendants SSW and UTU" and "[a]ny disputes regarding [petitioners'] prior rights and seniority shall be handled by the SSW and UTU through the grievance and arbitration procedures mandated by the Railway Labor Act and/or the Interstate Commerce Act." July 21, 1993 Final Judgment at 3, *reprinted in* Petitioners' App. at 95, 98.

15

**IV.**

The petitioners also, for reasons similar to their seniority objections, challenge the plan to change the location of their home terminal from Pratt, Kansas to Herington, Kansas. They argue that the arbitrator and the STB failed to adequately consider the consequences of siting the home terminal at Herington, and that these decision-makers failed to explain why the employees' living arrangements had to be disrupted to make the merger possible. The petitioners concede that the STB stated that siting the home terminal at Herington would produce public benefits—"efficiency gains, such as cost reductions and service improvements." As to the petitioners' claim that the unavailability of housing at the new site should be weighed against the public benefits of increased efficiency, the arbitrator held that the alleged burden was properly compensated for by moving allowances and other benefits provided to the petitioners under *New York Dock*.[13]

The petitioners argue that the general factors cited by the arbitrator—that the move would improve "adequacy of transportation to the public," "efficiency gains," "cost reductions," and "service improvements"—are insufficient to show the benefits of the move. They also point out the fact that the original plan was to retain Pratt as the home terminal, and the STB now has failed to demonstrate why moving the terminal to

---

[13]The *New York Dock* conditions provide that employees adversely affected by operational changes following a merger or consolidation are entitled to certain benefits, including up to six years of salary protection in the event of a dismissal or displacement and relocation benefits if employees are required to change their place of employment. *See New York Dock*, 360 I.C.C. 60, at art. I, secs. 5, 6 & 9.

16

Herington produces more efficiency gains. Again, they cite no authority requiring a more detailed statement of reasons by the arbitrator or by the STB.

Further, the STB notes that the petitioners have failed to show the advantage of siting the home terminal at Pratt in preference to moving it to Herington; and there is nothing to undermine the arbitrator's finding that transportation benefits would result from the move. The arbitrator found that changing the location of the home terminal was "part and parcel of the hub and spoke operation . . . at Salina." And the record supports this finding. For example, a declaration submitted by John M. Raaz, a Union Pacific assistant vice president, indicates that the location of the terminal at Herington would produce "additional flexibility gained by a single crew base protecting multiple directional operations from Herington" and would "provide[] the option of avoiding the major terminal of Kansas City in times of heavy congestion or flooding." Flexibility was made possible because the Herington base could support service in four directions: toward Pratt (west), Wichita (south), Kansas City (east), and Marysville, Kansas (north). The posture of the Herington base provided the flexibility to shift traffic from one route to another.

The Union Pacific also notes that the change in the location of the home terminal does not abrogate or modify any prior collective bargaining agreement, and, in fact, the Union Pacific has the right to change unilaterally the location of a home terminal. Even if the Union Pacific does not have such a right, the arbitrator's finding that the move was

17

necessary for the merger is not erroneous.

Further, the petitioners argue, the arbitrator and STB failed to consider the lack of proper facilities in Herington for the employees who would be forced to move there. Specifically, they argue that Herington does not have adequate housing and other facilities for transferred workers. This is challenged by the Union Pacific's uncontested assertion that the majority of employees that were required to move to Herington were able to do so. In addition, the petitioners argue that the commuting distance from Pratt to Herington, 135 miles away, would be unaccceptably long. Union Pacific notes that this factor is not a consideration the arbitrator was required to take into account. Even so, the petitioners do not deny that they continue to live and work in the Pratt area, and do not commute to Herington. In fact, they indicate that the arbitrator "allowed the Union Pacific to accommodate [trainmen who did not transfer to Herington] by allowing those nine to 'not be required to commute to Herington for their assignments.'" Petitioners' Br. at 49. And, even if a lengthy commute had required the petitioners' relocation, the petitioners would have been entitled to moving allowances and other benefits under *New York Dock*.

## V.

For the foregoing reasons, we AFFIRM.

18