279 F.3d 901
 James SPAULDING, Lyn Swonger, Donald L. Inman, William N. Nance, and all others similarly situated, Plaintiffs-Appellants,
v.
UNITED TRANSPORTATION UNION and Union Pacific Railroad Company, Defendants-Appellees.
 No. 01-3018.
 United States Court of Appeals, Tenth Circuit.
 February 5, 2002.
 
 1
 COPYRIGHT MATERIAL OMITTED Bruce H. Stoltze of Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, P.C., Des Moines, IA, for Plaintiffs-Appellants.
 
 
 2
 John A. Edmond of Guerrieri, Edmond & Clayman, P.C., Washington, DC, for Defendant-Appellee United Transportation Union.
 
 
 3
 Brenda J. Council of Kutak Rock LLP, Omaha, NE, for Defendant-Appellee Union Pacific Railroad Company.
 
 
 4
 Before EBEL and PORFILIO, Circuit Judges, and SHADUR, District Judge.*
 
 
 5
 SHADUR, District Judge.
 
 
 6
 This appeal stems from the 1996 merger of the Union Pacific Railroad Company ("Union Pacific") with the Southern Pacific Rail Corporation and its subsidiaries (collectively "Southern Pacific"). Acting on behalf of themselves and all others similarly situated, James Spaulding ("Spaulding"), Lyn Swonger ("Swonger"), Donald Inman and William Nance have brought suit against their union, the United Transportation Union ("Union"), and Union Pacific. Plaintiffs (a collective term used here to embrace the entire putative class, not just the named plaintiffs) are former employees of Southern Pacific now employed by Union Pacific. They charge that Union breached its duty of fair representation in negotiating implementation agreements associated with the 1996 merger and that Union Pacific colluded in that breach and wrongfully interfered with plaintiffs' contractual rights.
 
 
 7
 After reviewing the parties' submissions on defendants' motions for summary judgment under Fed.R.Civ.P. ("Rule") 56, the district court granted those motions as to all claims. Plaintiffs now appeal, asserting two grounds for reversal:
 
 
 8
 1. Their claims as to the Kansas City and Saint Louis Hubs are not barred by the statute of limitations.
 
 
 9
 2. As to the Salinas Hub, the district court had, and we now have, subject matter jurisdiction to hear their claims.
 
 
 10
 We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Because we find no error in the rulings of the district court, we AFFIRM its order in all respects.
 
 
 Standard of Review
 
 
 11
 We review the grant of summary judgment de novo, applying the same standard as did the district court (Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172, 1175 (10th Cir.2001)). Under Rule 56(c) summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law" (Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1108 (10th Cir.2001)). For that purpose, familiar Rule 56 principles impose on defendants as movants the initial burden of establishing the lack of a genuine issue of material fact (Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548). If that burden is met, plaintiffs as nonmovants must then come forward with "specific facts showing that there is a genuine issue for trial" (Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Rule 56(e) but adding emphasis)). On that score an issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Finally, in making our determination we, like the district court, are required to examine all of the evidence and draw all reasonable inferences in favor of plaintiffs as nonmovants (Thiessen, 267 F.3d at 1108).
 
 
 Background
 
 
 12
 We begin by rehearsing the complex factual background, essential to a full understanding of the current dispute. This case has its factual beginnings in 1975 when the Chicago, Rock Island and Pacific Railroad Company ("Rock Island") filed for bankruptcy. Plaintiffs were originally employed by Rock Island and later became employees of the St. Louis Southwestern Railway Company ("SSW") after it purchased a portion of Rock Island's trackage known as the Tucumcari Line in 1980. Currently plaintiffs are employees of Union Pacific as a result of its 1996 merger with Southern Pacific and its subsidiary SSW. They are also members of Union, their federally recognized collective bargaining organization.
 
 
 13
 
 Seniority, Prior Rights and the New York Dock Conditions
 
 
 
 14
 At the core of this action are the "system seniority dates" that railroad employees use to bid on particular jobs and schedules. Normally the date on which an employee took his or her first compensated trip for his or her current employer is the seniority date. If two employees bid on the same job, the one with the earlier seniority date normally wins the bid. But if a less senior employee retains a "prior right" at a particular job location, he or she could prevail at that location over a more senior bidder who has more seniority with the employer but who lacks such a locational prior right.
 
 
 15
 Seniority dates and prior rights are a major source of contention in railroad mergers. To fulfill its statutory obligation of safeguarding affected workers while still facilitating implementation of beneficial mergers, the Surface Transportation Board ("Board") often imposes the New York Dock conditions as a condition of merger approval.[1] Those labor-protective provisions require carriers to provide affected employees with economic protections significant in both amount and duration.
 
 
 Prior Litigation
 
 
 16
 SSW's purchase of Rock Island's Tucumcari line in 1980 was pursuant to an agreement executed on March 4, 1980 ("March 4 Agreement") that provided for preferential hiring of the Rock Island employees by SSW and other carriers taking over Rock Island's trackage. To effectuate the March 4 Agreement, SSW and Union entered into an implementing agreement in 1982 ("1982 Implementing Agreement"), which provided among other things that former Rock Island employees hired by SSW before that agreement would receive a system seniority date of March 24, 1980, while the seniority dates of those hired after the 1982 Implementing Agreement would coincide with their actual dates of hire by SSW.
 
 
 17
 Federal litigation then ensued when a class of former Rock Island employees brought suit, alleging that the 1982 Implementing Agreement violated their preferential hiring rights and their rights to retain their Rock Island seniority dates as established in the March 4 Agreement. After protracted litigation and a court-approved settlement, Volkman v. United Transp. Union, 724 F.Supp. 1282 (D.Kan. 1989), rev'd in part on other grounds, 73 F.3d 1047 (10th Cir.1996) established that no entitlement to retain Rock Island seniority dates derived from the March 4 Agreement. Instead March 24, 1980 was confirmed as the system seniority date for former Rock Island employees, including plaintiffs, hired by SSW before the 1982 Implementing Agreement (724 F.Supp. at 1307, 1327-28). Volkman also established that the former Rock Island employees were entitled to prior rights at their SSW terminal of first hire (id. at 1335), but those prior rights would be subject to future modification through collective bargaining (Volkman, No. 83-6025-T (D.Kan. July 22, 1993)).
 
 
 1996 Merger
 
 
 18
 In 1996 Board approved a merger between Union Pacific and Southern Pacific/SSW. One consequence was that the former Rock Island employees on the Tucumcari Line would again be displaced. To protect those and other affected workers, Board required that Union Pacific comply with the New York Dock conditions in implementing the merger. Pursuant to New York Dock conditions Art. I, § 4, Union Pacific gave notice to Union on October 6, 1997, January 30, 1998 and June 4, 1998 of its intention to establish three operational hubs: in the same order as those notification dates, Saint Louis, Missouri; Kansas City, Kansas; and Salina, Kansas. Extensive negotiations were undertaken, seeking to design mutually satisfactory implementation plans for the three hubs, including the seniority systems to be used for commingling the Union Pacific and Southern Pacific workforces. Those negotiations are the genesis of the present action.
 
 
 19
 Union's Const. Art. 90 requires that in effectuating a merger "General Committees of Adjustment shall arrange for a fair and equitable division of the work" and that "[p]rior seniority rights of employees to service on their former seniority district or territory shall be preserved to the extent possible." Union maintains that the integration of seniority lists in the event of a railroad merger is best accomplished by "dovetailing," and it sought to use that method in creating a consolidated seniority roster at each of the three hubs. Dovetailing accomplishes consolidation by using the seniority date of each employee on the properties involved in the merger.
 
 
 20
 Throughout the extended negotiations Union held to the position that the former Rock Island employees would retain their prior rights on the Tucumcari line as to SSW employees, but that they would gain no prior rights with respect to Union Pacific employees. As for seniority, Union officials repeatedly asserted at a series of Local meetings and negotiation planning sessions that former Rock Island employees would be assigned their SSW seniority dates rather than their Rock Island dates for dovetailing purposes: That is, employees hired by SSW before the 1982 Implementing Agreement would receive a seniority date of March 24, 1980 rather than their earlier dates of hire by Rock Island. Plaintiffs' union representative, Associate General Chairman Don Hollis ("Hollis"), specifically inquired whether the Rock Island seniority date would be granted, and he was repeatedly told that it would not. Employees affected by that negative answer contend that the failure to make such assignment violated the provisions of Volkman.
 
 
 Implementing Agreements
 
 
 21
 After that series of negotiations, Union and Union Pacific executed implementing agreements on July 29 and 30, 1998 for the St. Louis and Kansas City Hubs. Those agreements provided (1) that dovetailing would be effected by using each employee's "current seniority date" on the line on which he or she was currently employed and (2) that each employee would be assigned new prior rights in abrogation of all existing prior rights, although it was provided that the prior rights held by the former Rock Island employees on the Tucumcari line would be retained vis-a-vis other SSW employees. In accordance with Union's constitution, those agreements were put to a ratification vote and were approved by a majority of all the local chairmen.
 
 
 22
 Union Pacific and affected Union representatives conducted a week-long workshop between September 14 and 18, 1998 to consolidate the seniority rosters for the two hubs. Once again the issue of seniority dates for the former Rock Island employees was raised, and once again it was made clear that those employees would be assigned their SSW seniority date of March 24, 1980. Plaintiffs told Union Pacific and Union representatives at that time that they did not agree to that provision.
 
 
 23
 Meanwhile plaintiffs had continued objecting to the proposal that their seniority dates after merger implementation would correspond to their dates of hire by SSW rather than by Rock Island. In August 1998 Hollis again questioned that position with Union officials. Union President Little scheduled a September 23-24, 1998 meeting in Seattle, Washington to discuss the issue-and Union's position was once again reconfirmed.
 
 
 24
 On November 1, 1998 Union Pacific began to operate the Saint Louis Hub under the terms of the implementing agreement. Then on November 2 Union Pacific served notice of its intent to establish a negotiated implementing agreement for the Salina Hub with terms similar to those of the Kansas City and Saint Louis agreements. Another workshop to construct a consolidated seniority roster was conducted from November 16-20, 1998.
 
 
 25
 On December 2, 1998 Union and Union Pacific held a meeting to address Hollis' continuing concerns as well as other implementation issues in Kansas City and Saint Louis. There it was again reiterated that the former Rock Island employees would not be permitted to use their original Rock Island seniority dates for the dovetailed rosters and that they would retain prior rights on the Tucumcari line vis-a-vis other SSW employees. Despite the repeated rejection of his position, on December 28, 1998 Hollis refused to sign the Salina Implementing Agreement. Because Union's constitution requires the approval of all General Chairmen in affected jurisdictions before such agreements may be submitted for ratification, on January 5, 1999 Union Pacific invoked arbitration under New York Dock conditions Art. I, § 4 to procure an implementing agreement for the Salina Hub.
 
 
 26
 Next in the chronology, the Kansas City Hub was implemented on January 16, 1999. Arbitration as to the Salina Hub began shortly thereafter (on February 23, 1999). Despite plaintiffs' arguments that they were wrongfully being denied the right to use their Rock Island hire dates, on March 25, 1999 the arbitrator ruled to adopt the proposed Salina Implementing Agreement. Pursuant to the New York Dock conditions, Spaulding and Swonger appealed that decision to Board, and they moved to stay implementation of the Salina Hub pending resolution of the appeals process. Board denied that request for a stay, and the Salina Hub was implemented on May 1, 1999.
 
 
 27
 Plaintiffs had meanwhile written letters to various Union officials expressing their dissatisfaction with the negotiated seniority arrangement. On February 20, 1999 Spaulding sought to obtain a hearing before the Union Board of Appeals regarding plaintiffs' seniority rights by mailing a letter to Union's General Secretary and Treasurer. That request was denied by Union's President on March 22, 1999.
 
 
 28
 On June 2, 1999 plaintiffs filed the present action, contending primarily that by accepting the Implementing Agreements both Union and Union Pacific had abandoned the seniority rights to which plaintiffs were entitled. More specifically, Union is charged with breaching its duty of fair representation and Union Pacific is accused of colluding in the breach and interfering with plaintiffs' contractual rights. As stated earlier, both defendants filed motions for summary judgment on all claims-motions that the district court granted on December 29, 2000 on the grounds that (1) claims regarding the Saint Louis and Kansas City Hubs were barred by the statute of limitations and (2) it lacked jurisdiction to hear claims regarding the Salina Hub.
 
 
 29
 While defendants' summary judgment motions were pending, Board declined plaintiffs' petition for review of the decision in the Salina arbitration on May 1, 2000. Plaintiffs sought judicial review of that decision in this court on June 16, 2000, and another panel of this court rejected their arguments in Swonger v. Surface Transp. Bd., 265 F.3d 1135 (10th Cir.2001).
 
 
 Kansas City and Saint Louis Hub Claims — Statute of Limitations
 
 
 30
 Plaintiffs concede that a six-month statute of limitations applies to their duty-of-fair-representation claim under the Railway Labor Act, as well as to any directly linked breach of contract claim against Union Pacific, pursuant to DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 155, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) and such DelCostello progeny as Repstine v. Burlington N., Inc., 149 F.3d 1068, 1070-71 (10th Cir.1998). But they urge that such a limitations period was tolled by either (1) the doctrine of equitable estoppel or (2) their pursuit of internal union appeals. It will be recalled that plaintiffs filed this suit on June 2, 1999. Because we explain below that their claim accrued before December 2, 1998 and thus more than six months before they brought suit, their claim is time barred unless the statute of limitations was tolled.
 
 
 31
 It has long been established that a duty-of-fair-representation claim accrues and "the limitation period begins to run when an employee `knows or in the exercise of reasonable diligence should have known or discovered the acts constituting the union's alleged violations'" (Edwards v. Int'l Union, United Plant Guard Workers of Am., 46 F.3d 1047, 1053 (10th Cir. 1995), quoting Lucas v. Mountain States Tel. & Tel., 909 F.2d 419, 420-21 (10th Cir.1990) (per curiam)). As for plaintiffs' claims regarding negotiation of the Saint Louis and Kansas City Implementing Agreements, they were clearly aware of any alleged Union malfeasance by July 29 and 30, 1998, when the agreements expressly rejecting their position were executed. And as the district court correctly held, plaintiffs were on notice of their claims at the latest by September 18, 1998, when the consolidated seniority rosters were constructed with the use of their SSW seniority dates. Moreover, the agreements were ratified by a majority vote of the local chairmen in September 1998,[2] with even Hollis signing the agreements. There is thus no question that plaintiffs' duty-of-fair-representation claim as to those two hubs accrued well before December 2, 1998 and hence more than six months before suit was filed (Rucker v. St. Louis SW Ry. Co., 917 F.2d 1233, 1238 (10th Cir.1990); Landry v. Air Line Pilots Ass'n Int'l, 901 F.2d 404, 411 (5th Cir. 1990); Zapp v. United Transp. Union, 879 F.2d 1439, 1441 (7th Cir.1989)).
 
 
 Equitable Estoppel
 
 
 32
 But plaintiffs waited nearly a year after the implementing agreements were executed, and over eight months after the consolidated seniority roster was constructed, before they brought an action asserting their fair representation claim. They attempt to avert the bar of untimeliness by invoking the doctrine of equitable estoppel and arguing that Union's misrepresentations led them to delay filing. Equitable estoppel "prevent[s] a party from taking a legal position inconsistent with an earlier statement or action that places his adversary at a disadvantage" (Penny v. Giuffrida, 897 F.2d 1543, 1545 (10th Cir. 1990)). There are four elements of a traditional estoppel claim (id. at 1545-46):
 
 
 33
 (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the other party's conduct to his injury.
 
 
 34
 And mere reliance is not enough — such reliance on an adversary's misrepresentations "must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading" (Heckler v. Cmty. Health Servs., 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); Emery Mining Corp. v. Sec'y of Labor, 744 F.2d 1411, 1417 (10th Cir. 1984)).
 
 
 35
 Plaintiffs argue that the conduct of Union officials misled them into believing that their seniority was still an open issue. They cite several statements that assertedly indicated either that their Rock Island seniority dates would be used or that the issue was unresolved. For example, at least three plaintiffs declare that Hollis told them they would be granted their Rock Island seniority date when the hub implementing agreements went into effect, thereby inducing them to vote to approve the implementing agreements. Indeed, one plaintiff contends the Kansas City plaintiffs were initially told that the Implementing Agreements allowed them to use their Rock Island dates. But even when all of those claims are credited, they lose effect because all of the statements were made before the consolidated seniority rosters were constructed. Once the rosters were put together by using SSW dates, plaintiffs could not reasonably believe the agreements allowed them to use their Rock Island dates. So those claimed representations cannot toll the limitations period.
 
 
 36
 Plaintiffs further assert that even after roster construction Hollis continued to represent that they would receive their Rock Island seniority dates. They claim they were told that the seniority issue would be resolved at the December 2, 1998 meeting in Cleveland. They also contend they were told that Union would use the arbitration regarding the Salina Hub "as a guise" to address Saint Louis and Kansas City seniority.
 
 
 37
 Even if it were assumed that those remarks amounted to misrepresentation and that Union officials had reason to believe plaintiffs would rely on the statements to delay filing their claim, the district court correctly found that plaintiffs have failed to demonstrate such reliance was reasonable. Indeed, it was patently unreasonable for plaintiffs to rely on Hollis' repeated assurances that their seniority was still an open issue. They should have known they could not count on any suggestion by Hollis that he could singlehandedly alter previously executed Implementing Agreements (indeed, signed by Hollis himself as well as all other General Chairmen) and that Union had not settled on its position-surely that scenario could not justify their sitting back without taking the action required to advance their claim.
 
 
 38
 Nor did Hollis' later reversal of his own support for the Implementing Agreements in his October 3, 1998 letter to a Union Pacific vice-president at all indicate that Union's position had changed. To the contrary, Union unwaveringly held the same position it had held all along. In sum, any claimed reliance on Hollis' "lone wolf" promises made in defiance of Union's consistent rejection of his position-a rejection of which plaintiffs were admittedly aware-was simply not reasonable.
 
 
 39
 As for plaintiffs' awareness, Swonger and Spaulding have both declared that at the December 2, 1998 meeting Hollis "was not successful in dissuading the UTU and the UP from following the course they had previously set." That of course is an admission to having known that Union's position on the issue was settled before the December 2 meeting. As the district court aptly noted:
 
 
 40
 [P]laintiffs may have reasonably hoped that Hollis could convince the union to change its previous position, but they could not reasonably believe the union had not taken a position.
 
 
 41
 As for plaintiffs' profoundly unspecific assertion that Union itself somehow represented that the December 2 meeting would resolve the seniority issue, even with the benefit of favorable inferences — which, we repeat, must be reasonable-it cannot be said that Union knew the seniority issue was conclusively resolved but nevertheless misled plaintiffs as to the status of the issue. Because plaintiffs have presented no evidence from which a reasonable jury could find that reliance on that purported Union representation was reasonable, summary judgment is appropriate (Anderson, 477 U.S. at 248, 106 S.Ct. 2505; Richmond v. ONEOK, Inc., 120 F.3d 205, 208 (10th Cir.1997)).
 
 
 42
 As plaintiffs would have it, Union — at some unspecified time and through some unspecified person — assertedly made a statement that seniority would be resolved at the December 2 meeting. It was to negate the use of just such amorphous claims to avert summary judgment that the Supreme Court said in the first of its 1986 trilogy of cases construing Rule 56, Matsushita, 475 U.S. at 586, 106 S.Ct. 1348:
 
 
 43
 Second, the issue of fact must be "genuine." Fed. Rules Civ. Proc. 56(c), (e). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.
 
 
 44
 In the face of the overwhelming abundance and consistency of Union statements and conduct confirming that the issue was already conclusively resolved to plaintiffs' detriment, no tenable support justifies plaintiffs' delay in filing a duty-of-fair-representation claim.
 
 
 45
 Unwilling to acknowledge the compelling force of the wealth of evidence refuting their contention, plaintiffs urge that the district court improperly resolved disputed issues of material fact as to what representations were made and whether plaintiffs' reliance was reasonable. That simply mischaracterizes the district court's reasoning. Instead of resolving disputed factual issues, it assumed all of plaintiffs' allegations to be true and found that their uncontroverted knowledge that the executed Implementing Agreements rejected the use of their Rock Island seniority dates rendered reliance on any contrary representations unreasonable. Without reasonable reliance there can be no estoppel (Emery Mining, 744 F.2d at 1417). We review the district court's refusal to apply the doctrine of equitable estoppel for abuse of discretion (Arnold v. Air Midwest, Inc., 100 F.3d 857, 861 (10th Cir. 1996)), and we find the district court's ruling an indisputably proper exercise of its sound discretion.
 
 
 Internal Appeals
 
 
 46
 Caselaw here (as elsewhere) teaches that pursuing internal union appeals can also toll the statute of limitations even if the appeals ultimately prove futile (Volkman, 73 F.3d at 1055-56). But plaintiffs' fatal difficulty in that respect is that no such appeal was taken in accordance with Union's constitution.
 
 
 47
 Union's Const. Art. 90 provides in relevant part:
 
 
 48
 Any local or member of a local affected by action or decision of a Chairperson, Sub General Committee or General Committee, or by the decision of the International President with respect to this Article may appeal such action or decision to the Board of Appeals, provided such appeal is filed with the General Secretary and Treasurer within ninety (90) days from the date of the action or decision. The Chairperson, Sub General Committee, General Committee, or International President, as the case may be, shall be allowed thirty (30) days from the date the appeal is filed in which to reply to the appeal. The parties involved in an appeal shall exchange copies of the appeal and reply to the appeal.
 
 
 49
 It is uncontroverted that Hollis failed to file a formal appeal with Union's General Secretary and Treasurer as Article 90 requires. And his informal objections and correspondence with Union and Union Pacific officials could not serve as proxy for the prescribed dispute resolution procedures (Cohen v. Flushing Hosp. & Med. Ctr., 68 F.3d 64, 68 (2d Cir.1995); Pantoja v. Holland Motor Express, Inc., 965 F.2d 323, 328-29 (7th Cir.1992)). As the Seventh Circuit has prudently noted (quoting Pantoja in part), if the rule were otherwise plaintiffs could toll the statute indefinitely by making repeated informal requests to different union officials for further review (Christiansen v. APV Crepaco, Inc., 178 F.3d 910, 916 (7th Cir.1999)).
 
 
 50
 In an effort to overcome that fatal defect, plaintiffs argue on appeal that a General Chairman talking to and corresponding with union leaders actually constitutes an alternate method of pursuing a formal appeal under Union's constitution. They point to this earlier language in Const. Art. 90:
 
 
 51
 Disputes arising under this Article which cannot be resolved by the General Committee or General Committees shall be referred to the International President. The International President shall promptly assign an officer to assist the General Committee or General Committees involved in resolving the dispute. Failing to resolve the dispute the officer shall make a complete report and recommendation to the International President who, in turn, shall decide the dispute.
 
 
 52
 But that position is equally flawed, for it is plain that the quoted pre-appeal procedure was not involved in the situation at issue. It will be remembered that Hollis' further effort sought instead to obtain reconsideration of a decision that had already been reached with his concurrence — a decision embodied in the fully executed St. Louis and Kansas City Hub Implementing Agreements (which Hollis, like all other affected General Chairmen, had signed).
 
 
 53
 What actually transpired as the result of Hollis' continued expression of dissatisfaction with the seniority arrangement after the Implementing Agreements were signed was that Union President Little held a meeting in Seattle, Washington on September 23-24, 1998. And it was there reiterated to the participants, including the affected General Chairmen, that Rock Island seniority dates would not be granted. That too preceded plaintiffs' lawsuit by more than six months, so plaintiffs can gain nothing by seeking to pursue that alternate route to avoid the limitations bar.
 
 
 54
 Finally, Hollis' post-September requests for further review did not serve to toll the statute. Once a union has clearly responded negatively to an appeal, no continuing requests for review suffice to toll the statute (Stevens v. NW Ind. Dist. Council, United Bhd. of Carpenters, 20 F.3d 720, 730 (7th Cir.1994); Fox v. Parker Hannifin Corp., 914 F.2d 795, 804 (6th Cir.1990)).
 
 
 55
 We also agree with the district court that plaintiffs' own belated attempts to obtain a formal Union appeal did not toll the statute of limitations so as to make their duty-of-fair-representation claims timely. Spaulding filed the first formal appeal in accordance with Union's constitution on February 20, 1999, and it was rejected by Union's president on March 22, 1999. Even if the statute were viewed as having been tolled during the month in which that appeal was pending, plaintiffs still fail to satisfy the six-month limitations period because their claim was not filed until at least eight months after it accrued.
 
 
 56
 That also dooms the other branch of plaintiffs' hybrid claim, asserted against Union Pacific. Ever since DelCostello, 462 U.S. at 165, 103 S.Ct. 2281 it has been clear that a viable duty-of-fair-representation claim against an employee's union is the jurisdictional predicate for a correlative claim against the employer, so that the interdependent nature of the claims triggers the same six-month limitations period. We have consistently applied the same principle — see, e.g., Repstine, 149 F.3d at 1071.
 
 
 Summary
 
 
 57
 We therefore AFFIRM the district court's holding that plaintiffs' claims regarding the Saint Louis and Kansas City Hubs are barred against both Union and Union Pacific by the statute of limitations. That makes it unnecessary to address the district court's alternative holding that plaintiffs' duty of fair representation claims as to the Saint Louis and Kansas City Hubs were beyond the court's jurisdiction because they were subject to mandatory arbitration under New York Dock conditions Art. I, § 11.
 
 
 Salina Hub Claims — Lack of Subject Matter Jurisdiction
 
 
 58
 We now review the bidding on plaintiffs' remaining claim. After Hollis had torpedoed approval of the Salina Implementing Agreement by refusing to sign, Union Pacific invoked arbitration under New York Dock — and plaintiffs participated through counsel in both a written position statement and at oral argument. On March 25, 1999 the arbitrator ruled to adopt the proposed Salina Implementing Agreement. Next plaintiffs appealed to Board pursuant to the New York Dock conditions, but Board declined to review the arbitrator's decision. And finally plaintiffs then sought judicial review, but their claims were rejected by this court in Swonger, 265 F.3d at 1135.
 
 
 59
 As to the Salina Hub, the district court below held that plaintiffs' duty-of-fair-representation claim was within the exclusive jurisdiction of Board, so that the court was without subject matter jurisdiction over the claim. We review de novo such a dismissal of a claim based on lack of subject matter jurisdiction (Robinson v. Union Pac. R.R., 245 F.3d 1188, 1191 (10th Cir.2001)).
 
 
 60
 Both statute and caselaw confirm Board's exclusive authority to approve railroad mergers and consolidations (49 U.S.C. § 11321(a); Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 119-20, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991)). That authority extends to abrogating rights and obligations (including the modification of seniority rights) under existing collective bargaining agreements to the extent necessary to realize the public transportation benefits of a merger (Norfolk & W., id. at 127-28, 132-33, 111 S.Ct. 1156; Swonger, 265 F.3d at 1140-42). But in so doing, Board is bound to safeguard the rights of adversely affected employees (49 U.S.C. §§ 11324(b)(4), 11326; Norfolk & W., 499 U.S. at 120, 111 S.Ct. 1156).
 
 
 61
 As stated earlier, Board satisfied that obligation in the 1996 merger by conditioning its approval on the parties' observance of the New York Dock labor-protective conditions, which outline procedures for negotiation and binding arbitration to resolve conflicts that arise in merger implementations (New York Dock, 360 I.C.C. at 77-78). Board has the exclusive authority to review those arbitration awards, subject only to review in a Court of Appeals (28 U.S.C. §§ 2321(a), 2342(5)).
 
 
 62
 Here it was the district court's view that although a duty-of-fair-representation claim may sometimes be separate and distinct from the issues involved in an arbitration, the "vast majority" of plaintiffs' allegations were necessarily dependent upon issues squarely within the scope of the dispute presented to the New York Dock arbitrator. We agree, for the gravamen of the allegations in the complaint relates to Union's failure to negotiate an Implementing Agreement that preserved plaintiffs' seniority rights-see, e.g., Complaint ¶¶ 23 and 27(f):
 
 
 63
 The Implementing Agreements at the St. Louis Hub, the Kansas City Hub and Expanded Salina Hub failed to provide for these Plaintiffs and class members to maintain their prior right and other seniority and/or the equivalent of their prior and other seniority and equity rights vis-a-vis other members of the UTU, all in violation of their rights under the law, the pre-merger agreement, the constitution of the UTU and the Orders and Settlement Agreement of the previous litigation.
 
 
 64
 * * * * * *
 
 
 65
 [Union] either did not utilize the right under the contract with [Union Pacific] for it to establish the seniority and/or it abused or unfairly used said right to abridge the rights of these Plaintiffs and class members.
 
 
 66
 As we have indicated, whether a merger implementing agreement fairly blends the rights of plaintiffs with those of other affected employees and whether particular changes in seniority are necessary to effectuate a merger are matters within the exclusive jurisdiction of the arbitrator and Board (49 U.S.C. § 11321(a)). During the Salina Hub arbitration hearing, plaintiffs (who were allowed to participate through counsel) had argued in a written submission and orally that the agreement was not fair and the seniority changes were not necessary — that they had been wrongfully denied the right to use their Rock Island hire dates in constructing consolidated seniority rosters. After a full hearing and consideration the arbitrator decided against them, ruling that the Salina Hub represents "an obvious public transportation benefit and that considerations of efficiency of that operation warrant the modification and elimination of existing seniority rights as set forth in the proposed implementing agreement" and that the proposed agreement "represent[ed] a fair and equitable method of blending the rights of those employees with those of other Carrier affected employees." Because the Volkman orders specifically provided that the seniority rights of the former Rock Island employees were subject to modification through future collective bargaining, the arbitrator rejected plaintiffs' claim that the proposed Salina agreement contradicted those orders.
 
 
 67
 Plaintiffs presented their fairness and necessity arguments again in their appeal to Board and once again before this court in Swonger, 265 F.3d at 1141-43. Those appeals, resolved against plaintiffs, were their exclusive avenues of relief — they may not attack the arbitrator's ruling collaterally by seeking recourse in this proceeding (28 U.S.C. §§ 2321(a), 2342(5); United Transp. Union v. Norfolk & W. Ry. Co., 822 F.2d 1114, 1120-21 (D.C.Cir.1987)). Because 28 U.S.C. § 2342(5) expressly vests exclusive jurisdiction to review Board determinations in Courts of Appeals, the district court correctly held that it lacked subject matter jurisdiction over plaintiffs' duty-of-fair-representation claim based on Union's asserted failure to negotiate an agreement that preserved their seniority rights (Ry Labor Executives' Ass'n v. S. Pac. Transp. Co., 7 F.3d 902, 906-07 (9th Cir.1993); Bhd. of Ry. Carmen v. CSX Transp., Inc., 855 F.2d 745, 748-49 (11th Cir.1988)(per curiam)).
 
 
 68
 This case is unlike the usual duty-of-fair-representation challenge to a union's handling of an arbitration in that here the employees were also participants in the arbitration and thus, it would seem, would have had the opportunity to question the union's handling in the arbitration proceeding itself and in the direct review of the arbitration award to and including Swonger. But we need not decide whether that opportunity existed (something that could preclude a collateral attack here), for as United Parcel Serv. v. Mitchell, 451 U.S. 56, 61, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981), quoting Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), teaches:
 
 
 69
 As Hines makes clear, an employee may go behind a final and binding award under a collective-bargaining agreement and seek relief against his employer and union only when he demonstrates that his union's breach of its duty "seriously undermine[d] the integrity of the arbitral process."
 
 
 70
 Accord, Webb v. ABF Freight Sys., Inc., 155 F.3d 1230, 1242 (10th Cir.1998).
 
 
 71
 We have applied the factors outlined in Mitchell to the situation before us, and we conclude that plaintiffs have failed to adduce facts that could be said to "seriously undermine[ ] the integrity of the arbitral process." Their substantively deficient allegations as to Union's asserted violation of its constitution, its asserted failure to advance particular arguments, its claimed selection of a biased administrator and its purported failure to adopt a unified position fail to meet that test. And that is fatal to plaintiffs' claim against both Union and Union Pacific.
 
 
 Conclusion
 
 
 72
 As we have shown at considerable length, both defendants have carried their burden of showing the absence of any genuine issue of material (that is, outcome-determinative) fact. For their part, plaintiffs have failed to come forward with evidence establishing a genuine issue for trial. Because the district court correctly applied the substantive law, we AFFIRM the district court's order granting both defendants summary judgment and dismissing this action. Finally, this resolution of the substantive issues in the case moots plaintiffs' argument that the district court erred in determining not to certify this matter as a class action.
 
 
 
 Notes:
 
 
 *
 The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 [1]
 Railroad mergers must be approved by the United States Department of Transportation, Surface Transportation Board (49 U.S.C. §§ 11323-11326). Approval may be granted only if the combination is "consistent with the public interest," and Board is statutorily obligated to "provide a fair arrangement" for the protection of affected employees (id. §§ 11324(c), 11326(a)). As for the New York Dock conditions, they are a comprehensive set of labor-protective conditions outlined by the Interstate Commerce Commission ("ICC") in New York Dock Ry. ControlBrooklyn E. Dist. Terminal, 360 I.C.C. 60, 84-90 (1979), aff'd. sub nom. New York Dock Ry. v. United States, 609 F.2d 83 (2d Cir.1979). Until 1995 ICC was responsible for the rail-related functions, at which time they were assumed by Board (ICC Termination Act of 1995, Pub.L. No. 104-88, 109 Stat. 803 (1995)).
 
 
 [2]
 We have held that employees' ratification of an agreement bars claims that a union breached its duty of fair representation in negotiating the agreement (Gullickson v. SW Airlines Pilots' Ass'n, 87 F.3d 1176 (10th Cir. 1996), adopting and republishing the district court's analysis originally reported at 931 F.Supp. 1534, 1541-44 (D.Utah 1995)).