Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued December 12, 2003          Decided February 3, 2004

No. 02-1340

UNION PACIFIC RAILROAD COMPANY *F/K/A*
SOUTHERN PACIFIC TRANSPORTATION COMPANY,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
RESPONDENTS

SOUTHERN PACIFIC EMPOWERED EMPLOYEES COMMITTEE,
INTERVENOR

————

On Petition for Review of an Order of the
Surface Transportation Board

————

*Clifford A. Godiner* argued the cause for petitioner. With him on the briefs was *Rodney A. Harrison.*

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Ronald M. Johnson* was on the brief for *amicus curiae* National Railway Labor Conference in support of petitioner.

*Marilyn R. Levitt*, Attorney, Surface Transportation Board, argued the cause for respondents. With her on the brief were *Robert H. Pate III*, Assistant Attorney General, U.S. Department of Justice, *John J. Powers* and *Robert J. Wiggers*, Attorneys, *Ellen D. Hanson*, General Counsel, Surface Transportation Board, and *Craig M. Keats*, Deputy General Counsel.

Before: HENDERSON, ROGERS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* WILLIAMS.

Separate opinion filed by *Circuit Judge* HENDERSON concurring in the judgment.

WILLIAMS, *Senior Circuit Judge*: In an arbitration over benefits for workers adversely affected by a rail merger, the arbitrators decided the core liability issues against the carrier. The Surface Transportation Board declined to set aside or modify the award. The carrier appeals (now in the form of Union Pacific as successor by merger to the original acquiring firm). Applying the highly deferential standard of review that the Board claims is applicable, we find the Board's decision arbitrary and capricious and reverse.

\* \* \*

The statutes governing the type of rail merger in question require the Board to condition any approval on the merged carrier's agreement to provide labor protection benefits. 49 U.S.C. § 11326(a). In granting its 1988 approval for the merger of the Denver & Rio Grande and the Southern Pacific, the Board imposed its standard requirements, known as the *New York Dock* conditions. See 49 U.S.C. § 11326(a); *New York Dock Ry.—Control—Brooklyn E. Dist. Terminal*, 360 I.C.C. 60, aff'd sub nom. *New York Dock Ry. v. United States*, 609 F.2d 83 (2d Cir. 1979).

In 1989 the merged carrier consolidated various activities. Among these were the prior railroads' Denver and San Francisco computer systems, which the carrier joined in a "Management and Information Services" ("MIS") division at Southern Pacific's computer headquarters in San Francisco. And in 1992 the carrier gave notice of further consolidations between operations of Southern Pacific and the former Denver & Rio Grande; as a result, it and the Transportation Communications Union entered into a 1992 Implementing Agreement governing protection for certain groups of potentially affected employees.

In 1993 a task force headed by Thomas Matthews, the carrier's Senior Vice President and Chief Administrative Officer, recommended that the carrier outsource the functions of its merged MIS department. It proceeded to do so, engaging a completely separate firm, Integrated Systems Solutions Corporation ("ISSC"), to perform the department's functions. Many of the MIS employees moved to ISSC. A dispute arose between the carrier and some noncontract, nonunion MIS employees over whether this outsourcing was subject to the *New York Dock* conditions imposed in 1988. In December 1993 four such employees, together with the Southern Pacific Empowered Employees Committee ("SPEEC," pronounced "speak"), a self-described "voluntary organization" purporting to represent such employees, invoked arbitration under Article IV of the *New York Dock* conditions.

The parties agreed to bifurcate the arbitration, initially addressing only those issues applicable to all claimants. After a lengthy and unexplained delay, the panel issued a decision on March 20, 2000 (the "2000 Award"), finding that the MIS outsourcing was causally related to the 1988 merger in a manner bringing it within the reach of *New York Dock*'s provisions, and that the named complainants and SPEEC-represented individuals were "employees" rather than management for purposes of *New York Dock* eligibility. See generally *Newbourne v. Grand Trunk W. R.R. Co.*, 758 F.2d 193, 195 (6th Cir. 1985). The carrier appealed to the Board; while that appeal was pending, the panel issued a second decision on February 10, 2001, rejecting the carrier's claim

that a key witness's recantation required it to vacate its 2000 Award.

On September 17, 2002 the Board issued the decision now at issue ("Board Decision"). It applied its highly deferential "*Lace Curtain* standard"—established in review of an arbitration over a "lace curtain allowance," which is awarded for expenses incurred "preparing a newly-purchased home for occupancy." *Chicago & N. W. Transp. Co.—Abandonment* ("*Lace Curtain*"), 3 I.C.C.2d 729, 730 n.2 (1987), aff'd sub nom. *International Bhd. of Elec. Workers v. I.C.C.*, 862 F.2d 330 (D.C. Cir. 1988). As the Board said:

> Under the *Lace Curtain* standard, we limit our review of arbitrators' decisions to "recurring or otherwise significant issues of general importance regarding the interpretation of our labor protective conditions." . . . We do not review issues of causation, the calculation of benefits, or the resolution of other factual questions in the absence of egregious error.

Board Decision at 6. See also *Lace Curtain*, 3 I.C.C.2d at 735 (citing *Loveless v. Eastern Air Lines, Inc.*, 681 F.2d 1272, 1275–76 (11th Cir. 1982)).

Finding that the carrier had "failed to make the requisite showing under our *Lace Curtain* standards," the Board "denied" the carrier's request that it "review" the award. Board Decision at 10. Although the wording may suggest that "review" is purely discretionary, the Board's 10–page, single-spaced opinion in reality expresses a conclusion that the arbitrator's decision contained no error cognizable under *Lace Curtain*.

\* \* \*

*Jurisdiction*

The Board argues that we lack jurisdiction to hear Union Pacific's appeal because its Decision was not final.

The Hobbs Act gives the courts of appeals exclusive jurisdiction to review the Board's "rules, regulations, or final orders." 28 U.S.C. § 2342(5). For an order to be final, two conditions must be satisfied: the order must not be "tentative" or "interlocutory" in nature, and it must be an action in which "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). These factors are interpreted pragmatically, *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967), to assure that courts neither "improperly intrude[ ] into the agency's decisionmaking process" nor "squander[ ] judicial resources" through piecemeal review. *Ciba-Geigy Corp. v. United States EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986).

Here, there is little practical concern pointing against review. There is no suggestion that the Board's decision is tentative or interlocutory; rather, it completes the liability phase of a proceeding that the parties agreed to bifurcate. See *Hart Surgical, Inc. v. UltraCision, Inc.*, 244 F.3d 231, 235 (1st Cir. 2001) ("[T]he definiteness with which the parties have expressed an intent to bifurcate is an important consideration."); *Trade & Transp., Inc. v. National Petroleum Charterers, Inc.*, 931 F.2d 191, 195 (2d Cir. 1991) ("[I]f the parties have asked the arbitrators to make a final partial award as to a particular issue and the arbitrators have done so, the arbitrators have no further authority, absent agreement by the parties, to redetermine that issue."); see generally *Role Models Am., Inc. v. White*, 317 F.3d 327, 331 (D.C. Cir. 2003) ("To be final, an action need not be 'the last administrative [action] contemplated by the statutory scheme.'" (citation omitted)). And the Board itself decided to review the panel's award despite SPEEC's argument that the award was not a "final arbitration decision" for purposes of 49 C.F.R. § 1115.8. See *Public Utilities Comm. of Calif. v. FERC*, 894 F.2d 1372, 1377 (D.C. Cir. 1990) (considering position taken by agency under review when deciding whether its order is final). Indeed, a possible benefit for the Board is that our resolution on the merits may moot the second phase of the proceeding. See *id.*

It is also apparent that by declining to "review" the arbitration panel's award, the Board's order determined rights from which legal consequences will flow. The panel concluded that the outsourcing was causally related to the 1988 merger and that the SPEEC-represented individuals were "employees" of the sort eligible for *New York Dock* benefits. Given the Board's decision upholding those conclusions, all that remains to be decided is the amount of those benefits for each affected employee. See *Hart Surgical*, 244 F.3d at 234–35 (holding that court has jurisdiction under the Federal Arbitration Act to review arbitration awards that determined only liability and not damages). While those damages might amount to nothing for any given individual, the chance that the remaining proceedings will moot the case by giving victory to Union Pacific as to all claimants seems remote. See *Public Utilities Comm.*, 894 F.2d at 1377. Nor does it appear that the issues likely to arise in such proceedings would much overlap with the claims that are central here, so that serious duplication of appellate effort seems unlikely. We find the Board's decision "final" for purposes of our jurisdiction.

*Standard of review*

The carrier argues that we should review the arbitration panel's decision directly, rather than limiting our inquiry to whether the Board acted arbitrarily and capriciously in the application of its *Lace Curtain* standard. Compare *Association of American Railroads v. Surface Transp. Bd.*, 162 F.3d 101, 112 (D.C. Cir. 1998) (Sentelle, J. concurring in part and dissenting in part) (stating that the court may be required to directly review the arbitrator's decisions when the Board has applied *Lace Curtain* review), with *Swonger v. Surface Transp. Bd.*, 265 F.3d 1135, 1139–40 (10th Cir. 2001) (stating without explicitly deciding that judicial review is limited in this situation to whether the Board properly declined to review the arbitration panel's decision). In *Association of American Railroads* the Board had issued an order, under a cognate labor protection provision, 49 U.S.C. § 10902(d), requiring arbitration for disputes arising under that order, and we upheld the Board. Judge Sentelle noted in his concur-

rence that the court's decision did *not* address the scope of our review if an arbitration decision emerging from such a scheme should reach us after the Board denied review under its *Lace Curtain* standard. 162 F.3d at 111–12. He contrasted that scenario with ordinary arbitration arising out of a party's "voluntary act, either at the time of the dispute or at an earlier time in a contract providing for such arbitration," *id.* at 111, and reasoned that the Board could not, by combining its arbitration mandate with *Lace Curtain* review, "finesse a litigant" out of its statutory right to judicial review under the standard principles of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). *Association of American Railroads*, 162 F.3d at 112. Accordingly, he said, we would have to either "directly review" the arbitrator's decision as a final agency decision, or find some other remedy. *Id.* Union Pacific argues for precisely such direct review.

Whether the Board can finesse a litigant out of its statutory right to judicial review under standard APA principles presents a serious question. Compare *International Bhd. of Elec. Workers v. ICC*, 862 F.2d 330, 336 (D.C. Cir. 1988) (noting that, had the ICC not elected to mandate arbitration, "all disputes over employee protective conditions would have remained solely within the primary jurisdiction of the agency"). And we note that although this court has repeatedly rejected claims that the Board's *Lace Curtain* standard of review is too *broad* in scope, see, e.g., *United Transp. Union v. ICC*, 43 F.3d 697 (D.C. Cir. 1995); *Railway Labor Executives' Ass'n v. United States*, 987 F.2d 806, 811–12 (D.C. Cir. 1993) (per curiam); *International Bhd. of Elec. Workers*, 862 F.2d at 332, we have never before addressed the argument that the standard is too *narrow*, or that the resulting layers of deference unlawfully place the arbitration result beyond judicial review. See 5 U.S.C. § 706; *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987) ("While the Hobbs Act specifies the form of proceeding for judicial review of ICC orders, see 5 U.S.C. § 703, it is the Administrative Procedure Act (APA) that codifies the nature and attributes of judicial review[.]"). Cf. *Crowell v. Benson*, 285 U.S. 22, 49–52 (1932).

Nevertheless, because we find that the Board applied *Lace Curtain* deference to the panel's 2000 award in an arbitrary and capricious manner, we leave to another day the question of whether litigants are entitled to direct judicial review of such arbitration decisions.

*Merits*

While Union Pacific attacks much of the arbitration panel's 2000 Award, we find that as to two aspects the Board's nonchalant complaisance was arbitrary and capricious and require that the Board order, and of course the underlying award, be set aside.

In finding that the 1993 MIS outsourcing was causally related to the 1988 merger the panel relied solely on a declaration by Charles Lamb, the carrier's Director of Labor Relations. See 2000 Award at 13 ("We believe the Lamb Declaration is pivotal."); Lamb Declaration, at Joint Appendix 225–28. After ruling out "but for" causation as sufficient to link the merger to the outsourcing, see 2000 Award at 11 ("Not every adverse action following such a transaction necessarily is caused by the transaction.... The nexus or connection must be primary and direct rather than secondary and indirect."), the panel found that:

> Lamb states unequivocally in his Declaration that he gave the [*New York Dock*] notice pertaining to the 1992 transaction and intended thereby to preserve the Carrier's option of outsourcing the MIS Department which he considered to have been authorized by the ICC in the 1988 merger-control proceeding. We believe that statement clearly links the outsourcing to the merger-control transaction such as to establish sufficient causal nexus between the transaction and the outsourcing of the MIS Department.

2000 Award at 14. The Board "decline[d] to review the ... causation finding" because "[t]he Panel found that Witness Lamb's testimony about the carrier's meaning and intent of the 1992 notice and agreement was more credible than the

testimony of a carrier witness, Thomas Matthews. . . ."
Board Decision at 7.

But in fact the Lamb Declaration doesn't support the
panel's conclusion. First, the panel found that Lamb "consid-
ered" the 1993 outsourcing "to have been authorized by the
ICC in the 1988 merger-control proceeding." 2000 Award at
14; see also Lamb Declaration at 3 ("To the extent that
outsourcing would subsequently consolidate or impact on the
MIS department employees, such effects were clearly author-
ized under the ICC transaction approval. . . ."). But it is
undisputed that the carrier did not begin to study the out-
sourcing of its MIS department until 1990, see 2000 Award at
3, and that the task force which recommended outsourcing
was not appointed until 1992, see *id*. at 4. Thus, the ICC's
merger authorization could not have specifically contemplated
the 1993 MIS outsourcing; nothing Lamb "considered" could
change that.

Nor do Lamb's other statements support the panel's find-
ing that the 1988 merger caused the 1993 outsourcing.
Lamb's declaration said that the carrier's 1992 *New York
Dock* notice was intended "to embrace all clerical, non-
operating positions, including the MIS employees," Lamb
Declaration at 2, and that the carrier wanted "to preserve the
broadest authority granted us under the ICC transaction
approval to consolidate our clerical positions, thereby estab-
lishing the Carrier's unfettered regulatory authority and dis-
cretion to implement any subsequent consolidations or per-
sonnel actions impacting on our clerical personnel, including
the MIS employees, arising from the D&RGW–SP transac-
tion," *id*. at 2–3. Rather than showing that the 1993 out-
sourcing was causally related to the 1988 merger, this opaque
statement says only that the carrier wrote its 1992 *New York
Dock* notice as broadly as possible so that it could implement
"any subsequent consolidations or personnel actions . . . aris-
ing from the D&RGW–SP transaction." *Id*. at 2. It thus
begs the question the arbitration panel was to answer:
whether the 1993 outsourcing in fact was a consolidation or
personnel action directly "arising from" the Denver & Rio
Grande/Southern Pacific merger. Compare *Brotherhood of*

*Locomotive Eng'rs v. ICC*, 885 F.2d 446, 451 (8th Cir. 1989) (approving arbitrator's finding of a "reasonably direct causal connection"—more than "a mere but for standard"—between the merger and the adverse action).

Not only did the Lamb Declaration not adduce a single fact tending to establish a causal relation between the 1988 merger and 1993 outsourcing, but the timing and character of the transactions undermine any such idea. Thomas Matthews—who was primarily responsible for the outsourcing and who did not join the carrier until 1991, three years after the merger—explained that the outsourcing was done for financial reasons entirely unrelated to the merger. See Matthews Declaration at 1–2. No evidence was offered contradicting those reasons. Given that an outsourcing is on its face utterly different from a consolidation, and that the merged carriers had *already* consolidated their computer systems, it would take some specific evidence to establish causality, rather than the vague, question-begging conclusions offered by Lamb.

In *American Train Dispatchers Ass'n v. CSX Transportation, Inc.*, the Board explained that under its *Lace Curtain* standard it would vacate arbitration awards "when there is egregious error," meaning that the award is "irrational, wholly baseless and completely without reason, or actually and indisputably without foundation in reason and fact." 9 I.C.C.2d 1127, 1130–31 (1993) (internal quotations and citation omitted). But here the arbitration panel found the Lamb Declaration to be "pivotal" even though it provided no support whatever for a finding of causation, and all other evidence pointed away from such a finding. We conclude therefore that the arbitration panel's finding that the 1993 outsourcing was causally related to the 1988 merger was "actually and indisputably without foundation in reason and fact," and that the Board acted in an arbitrary and capricious manner in not "reviewing" the 2000 Award, even under the Board's generous *Lace Curtain* standard of review.

Although this error is reason enough to vacate the Board's order, the Board and arbitrators committed a second plainly

egregious error in upholding SPEEC's persistent refusal to identify the MIS employees that it purported to represent. See *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 587 (D.C. Cir. 2001) ("If a plaintiff presents two or more alternative grounds as routes to its hoped-for ultimate victory, a court does not lose jurisdiction over the second claim once it has ruled in the plaintiff's favor on the first claim; victory on the first claim doesn't moot the second." (citation omitted)). The Board first argues that the carrier is precluded from making this argument because it did not do so below. The record shows otherwise. The carrier brought this issue first to the attention of SPEEC and the neutral arbitrator, see September 24, 1997 letter from Clifford A. Godiner to John F. Henning, Jr. ("1997 letter"), and later argued it on appeal to the Board, see Carrier's Appeal From Arbitration Award at 19–20. And both the arbitrator and the Board addressed the carrier's argument that SPEEC should be required to identify those employees who had designated SPEEC as their representative. See 2000 Award at 25; Board Decision at 6–7. Although the carrier didn't articulate the problem as sharply as it does now, any serious focus on its complaint about SPEEC's refusal to identify those it claimed to represent, or to demonstrate its representative authority, would have led a decisionmaker to the core problem. Accordingly, we will review the arbitrators' and the Board's decisions on this issue.

We do not question for a minute the Board's view that non-union employees seeking *New York Dock* benefits may agree to be represented by a single lawyer or firm. See Board Decision at 6–7. Further, we may assume that such employees may enter into binding agreements among themselves about the allocation of costs, etc. But both arbitrators and Board appear to have been willfully blind to the effects of their decisions allowing SPEEC to operate behind an impenetrable veil. SPEEC's complete opacity as to just *who* it represented put the carrier in a classic heads-I-win-tails-you-lose position. If SPEEC's approach were valid, the preclusive effects of any judgment would be thoroughly asymmetrical. Just as victory has a thousand fathers while defeat is an

orphan, a SPEEC victory could be invoked by all MIS employees and a SPEEC defeat could be disclaimed by all—except the four proceeding under their own names. The judgment would give the carrier neither the preclusive effects of litigation with a bargaining unit's exclusive representative, nor those of a class action, in which a class is certified, notice is given, and potential class members must affirmatively opt out, see Fed. R. Civ. P. 23(c)(1)-(2). While the Supreme Court has allowed the use of non-mutual collateral estoppel, see *Blonder-Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313 (1971); see also *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) (allowing offensive non-mutual collateral estoppel), it has rested such use on the view that relitigation of an issue, once resolved in a case giving the losing party a full and fair opportunity to defend, would waste resources. See, e.g., *Blonder-Tongue*, 402 U.S. at 329; *Parklane*, 439 U.S. at 329–33. Even then, it disallows preclusion where its use would create perverse incentives or unfairness. *Parklane*, 439 U.S. at 331. Here, the arbitrators' decision allowing SPEEC to keep its membership secret gave potential plaintiffs "every incentive to adopt a 'wait and see' attitude," *id.* at 330, entitled to any winnings and free from any losses. That incentive, and the absence of any drawback to requiring SPEEC to identify the employees it represented up front, clearly demonstrate the arbitration panel's error. This grotesquely lopsided procedure seems precisely the sort of "egregious error" that even under *Lace Curtain* the Board should be expected to quash.

As the award and the order are also subject to vacation on substantive grounds, this procedural error can entail no immediate additional remedy. In the event of further *New York Dock* claims by MIS employees, it will remain for the Board in the first instance to determine the preclusive effects of this judgment. The panel noted and apparently accepted as probative a declaration by a founding member of SPEEC to the effect that 287 MIS employees attended an initial SPEEC meeting, that a majority at that meeting "designated SPEEC to represent them," and that "such majority made a financial contribution" to fund the arbitration proceeding.

2000 Award at 25; see also Markovich Declaration at 4–5. SPEEC submissions evidently allude to "sign-up sheets" distributed at several meetings and to lists of persons who "signed up," see 1997 letter, but SPEEC never disclosed any such lists or sign-up sheets.

*   *   *

The Board's decision is accordingly reversed.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in the judgment:

I concur in the majority's holding that the arbitration panel committed egregious error in finding the 1993 MIS outsourcing causally related to the 1988 merger and that the Surface Transportation Board therefore acted arbitrarily and capriciously in denying review of the erroneous arbitration award. I do not join the majority's discussion of what it terms the "second plainly egregious error" of the arbitration panel, upheld by the board—namely, failing to require SPEEC to identify the employees it represented. Maj. op. at 10–12.* Whether or not the majority is correct that this failure was "procedural error," there is, as the majority apparently recognizes, no need to address the issue in light of our having found egregious error in the panel's substantive decision. *See* maj. op. at 12 ("As the award and the order are also subject to vacation on substantive grounds, this procedural error can entail no immediate additional remedy."). In the unlikely event that an employee makes a future *New York Dock* claim related to the 1993 outsourcing (notwithstanding our substantive holding in favor of Union Pacific), at that time, as the majority indicates, the Board might have occasion to decide whether the claim is barred by collateral estoppel because the claimant was a party to this arbitration with a full and fair opportunity to litigate the causality issue. *See* maj. op. at 12 ("In the event of further *New York Dock* claims by MIS employees, it will remain for the Board in the first instance to determine the preclusive effects of the judgment."); *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 480–481 (1982) (collateral estoppel applies only when party against which earlier decision is asserted had " 'full and fair opportunity' to litigate that issue in the earlier case") (quoting *Allen v. McCurry*, 449 U.S. 90, 95 (1980); *Montana v. United States*, 440 U.S. 147, 153 (1979); *Blonder-Tongue Labs. v. Univ. of Ill. Found.*, 402 U.S. 313, 328–29 (1971)) (footnote omitted); *see e.g., Bhd. of Locomotive Eng'rs v. CSX Transp. Inc.*, 9 I.C.C.2d 713, 723 (1993) (finding no collateral estoppel because employees were

---

* I also do not join in the majority's speculation on whether the court should—in another case—conduct direct review of an arbitrator's decision. *See* maj. op. at 6–8.

not parties to earlier proceedings); *id*. at 727–28 (two commission members dissenting because it appeared employees seeking labor protection were represented by union in prior proceeding).  Until such time, discussion of the procedural issue is hypothetical.  Accordingly, I see no reason to address it in our review of the STB decision now before the court.