*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0058p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TIMOTHY W. BLACK and THOMAS K. SORGE,

*Petitioners,*

*v.*

SURFACE TRANSPORTATION BOARD and UNITED
STATES OF AMERICA,

*Respondents,*

GRAND TRUNK WESTERN RAILROAD,

*Intervenor.*

No. 06-3045

---

On Petition for Review of an Order
of the Surface Transportation Board.
No. FD 28676 5

Argued: November 3, 2006

Decided and Filed: February 9, 2007

Before: RYAN, BATCHELDER, and SUTTON, Circuit Judges.

---

**COUNSEL**

---

**ARGUED:** Mary S. O'Neill, MURRAY & MURRAY CO., L.P.A., Sandusky, Ohio, for
Petitioners. Erik Light, SURFACE TRANSPORTATION BOARD, Washington, D.C., for
Respondents. Robert S. Hawkins, BUCHANAN INGERSOLL & ROONEY, Philadelphia,
Pennsylvania, for Intervenor. **ON BRIEF:** Mary S. O'Neill, Thomas J. Murray, Jr., MURRAY &
MURRAY CO., L.P.A., Sandusky, Ohio, for Petitioners. Craig M. Keats, SURFACE
TRANSPORTATION BOARD, Washington, D.C., John J. Powers III, Robert J. Wiggers, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Robert S. Hawkins,
BUCHANAN INGERSOLL & ROONEY, Philadelphia, Pennsylvania, for Intervenor.

---

**OPINION**

---

SUTTON, Circuit Judge. Timothy Black and Thomas Sorge challenge a decision of the
Surface Transportation Board affirming an arbitration panel's ruling denying them relief under a
railroad merger labor protection agreement. We deny the petition.

I.

In 1979, the Interstate Commerce Commission (ICC) approved the Grand Trunk Western Railroad's acquisition of the Detroit, Toledo and Ironton Railroad Company and the Detroit and Toledo Shore Line Railroad Company. *See Norfolk & W. Ry. Co.–Control–Detroit, Toledo & Ironton R.R. Co.*, 360 I.C.C. 498 (1979). The ICC conditioned its approval of the merger on Grand Trunk's adoption of several labor-protective conditions—each of which Grand Trunk and the affected railroad unions eventually incorporated into a Master Agreement. JA 81–88; *see* 49 U.S.C. § 11347 (1979), *revised and recodified at* 49 U.S.C. § 11326 (requiring the ICC to impose conditions on any railroad merger to ensure that the employees are guaranteed certain benefits for at least four years after the merger).

**The Master Agreement**. The Master Agreement incorporated what have come to be known as the *New York Dock* conditions—by which railroads may "move employees from one work site to another in order to achieve the benefits of a merger transaction" so long as they guarantee workers certain employment protections, including at least six years of compensation. *Canadian Nat'l–Control–Ill. Cent.*, 4 S.T.B. 122, 164 (1999); *see New York Dock Ry.–Control–Brooklyn E. Dist. Terminal*, 360 I.C.C. 60, 84 (1979) (Appendix III). Disputes arising from application of the *New York Dock* conditions are subject to binding arbitration. *New York Dock Ry.*, 360 I.C.C. at 87–88.

In addition to incorporating the *New York Dock* conditions, the Master Agreement went a few labor-protective steps further—by granting each employee benefits "until [he or she] qualifies for early retiree major medical benefits," JA 82, and by providing that "no reduction in force of employment shall occur other than principally by death, retirement, discharge for cause, or resignation," *Norfolk & W. Ry.*, 360 I.C.C. at 531. To accommodate then-furloughed employees of the smaller Detroit and Toledo Shore Line Railroad Company, the Agreement provided that such employees "shall be obligated to accept a reasonably comparable position . . . [,] which does not require a change in residence in order to maintain their protection hereunder." JA 83.

**Agreement H of the 1981 Working Agreements**. The Master Agreement was not self-executing. It required Grand Trunk to enter into separate working agreements with each of the unions before the Master Agreement became effective. In 1981, Grand Trunk and the Brotherhood of Railway Carmen adopted the 1981 Working Agreements to implement the Master Agreement. Agreement H of the 1981 Working Agreements provided that "[i]t is the intent and purpose of this Agreement to provide for expedited changes in services, facilities and operations and for the orderly transfer of protected employees, work and positions between the G.T.W. and D.T. & I. Railroads and within the two Railroads" and that Grand Trunk "will not be required to hire a new employee at any point for a position that is subject to the G.T.W. – D.T. & I. – B.R.C. Working Agreement at a time that a B.R.C. protected employee who is qualified . . . for such position is receiving protection compensation as a furloughed employee." JA 183 (Agreement H, Section I(1)). Agreement H was intended only to "clarify conditions, responsibilities and obligations of protected employees," not to "eliminate or reduce any existing conditions, responsibilities or obligations as pertaining to protected employees." JA 190 (Agreement H, Section V(2)).

Agreement H obligated Grand Trunk to try to fill vacant positions with local employees. JA 187 (Agreement H, Section II(1)). If it could not do so, Grand Trunk had the option of offering the position to "furloughed protected employees at other points receiving compensation . . . in reverse order of seniority." *Id.* (Agreement H, Section II(2)). In the event transferred employees needed to change their residence, they could elect one of four options: (1) they could transfer to the position; (2) they could transfer to another available job in the system while maintaining their seniority at their original work site; (3) they could take a lump sum buyout; or (4) they could be furloughed without protective benefits but subject to recall. JA 188.

Agreement H likewise provided that "[w]ork, positions and/or employees may be transferred to another seniority point." JA 183 (Agreement H, Section I(2)). Under this agreement, then, Grand Trunk could transfer a position to another point in the system, though it had to try to fill the new position with local employees. JA 184 (Agreement H, Section I(2)(A)(a)). If it could not, Grand Trunk could "assign the junior protected employee at the point where the work is being transferred from to such position." *Id.* (Agreement H, Section I(2)(A)(b)). If that worker had to change his residence, he had the same four options outlined above. JA 184–85 (Agreement H, Section I(2)(A)(b)). By contrast, when the railroad abolished a position, Agreement H provided only that the displaced worker would maintain his seniority at his original work site. JA 186 (Agreement H, Section I(2)(B)).

**The Extra Board Agreement**. In 1983, Grand Trunk and the Brotherhood of Railway Carmen agreed to modify the method of compensating union members furloughed with compensation. The resulting Extra Board Agreement stated that all employees "who would otherwise stand to be furloughed as a result of a reduction in force will . . . be placed on an extra board" instead of receiving dismissal allowances, JA 89, which is to say they would stand ready to work in case of an unexpected personnel shortage at their local work site. The agreement, together with several side letters, clarified that all references to "furloughed protected employees receiving protection compensation" would now apply to "protected employees on an extra board." JA 98 (March 25, 1983 Side Letter to Extra Board Agreement).

**Underlying Claim**. In April 2004, Grand Trunk abolished seven carmen positions—railroad employees who inspect and maintain the railway cars used in freight and passenger trains—at its Toledo, Ohio railyard. Because the rail system had carmen vacancies at the time, Grand Trunk offered each of the displaced carmen four options in accordance with the provisions of Agreement H: (1) filling one of the vacancies at a railyard in Flint, Michigan, (2) displacing a less-senior carman at another facility, (3) accepting a lump-sum buyout or (4) remaining in Toledo without compensation but eligible for recall.

Black and Sorge, two of the carmen, rejected these options, demanding instead that they be placed on an extra board at the Toledo railyard. The two carmen claimed that Section 7 of the Master Agreement prohibited Grand Trunk from transferring them to another location and that the Extra Board Agreement required Grand Trunk to place them on an extra board because their positions had been abolished. Grand Trunk responded that "carman positions are available at Flint, Michigan," freeing it of any obligation to create an extra board. JA 146. Grand Trunk also construed their refusal to be transferred or bought out as choosing "furlough without protection," but it said that it would give the two men additional time to accept the vacant carman positions in Flint. *Id.*

Black and Sorge first sought to resolve this dispute through their union, the Brotherhood of Railroad Carmen. The union refused to help, noting that because the two men had "declined [Grand Trunk's] offers of employment, there [were] no Agreement provisions[] to now pursue a claim." JA 51. When the union also refused to represent the two men in arbitration with Grand Trunk, they obtained their own counsel and pursued arbitration of their claim.

A divided three-member arbitration panel—made up of a representative from Grand Trunk, a representative of the carmen and a neutral member—denied the claim. In the panel's view, Agreement H "obligated Claimants to accept a transfer to fill an available vacancy or have their protective benefits suspended." JA 50. Not only was this interpretation "entirely consistent with the past practice on the Property," the panel concluded, JA 50–51, but it also was "consistent with *New York Dock* Awards that hold that employees must accept positions that would require them to move or else be placed on furloughed status without benefits," JA 51. The panel also found that

there was "no evidence that the Parties to the 1979 Agreement ever considered it to limit the Carrier's right to transfer protected employees."  JA 52.

Black and Sorge appealed the arbitration award to the Surface Transportation Board, the successor agency to the ICC.  *See* ICC Termination Act of 1995, Pub. L. 104-88, 109 Stat. 803 (1995).  Applying the deferential *Lace Curtain* standard of review to arbitration awards, the Board denied their appeal.  *See Chicago & N.W. Transp. Co.–Abandonment*, 3 I.C.C.2d 729 (1987) (*Lace Curtain*), *aff'd sub nom. Int'l Bhd. of Elec. Workers v. ICC*, 862 F.2d 330 (D.C. Cir. 1988).  The Board rejected their contention that Section 7 of the Master Agreement prevented Grand Trunk from transferring them under Agreement H, reasoning that at most the provision protected "those DTSL employees who were receiving dismissal allowances at the time the [Master] Agreement took effect."  JA 13–14.  The Board also held that Agreement H "clearly contemplated that an employee receiving protection will lose that protection if he refuses to accept a reasonably comparable position," JA 13, and that the Extra Board Agreement did not curtail Grand Trunk's right to transfer employees under Agreement H.  Under these circumstances, the Board concluded, the arbitration panel's denial of petitioners' claim was "not irrational."  JA 14.

## II.

### A.

Congress has delegated responsibility to the Surface Transportation Board (and the ICC before it) to impose labor-protective conditions on railroads that merge their operations.  49 U.S.C. § 11326 ("[T]he [Board's] order approving the [merger] transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Board . . . .");  *Norfolk & W. Ry. Co. v. Nemitz*, 404 U.S. 37, 40–43 (1971).  The Board has jurisdiction to oversee disputes regarding the scope of these labor-protective conditions, and it customarily exercises this power by requiring parties initially to submit disputes to arbitration.  *See Int'l Bhd. of Elec. Workers v. ICC*, 862 F.2d 330, 336 (D.C. Cir. 1988) (stating that absent the Board's delegation of authority to arbitration panels, "all disputes over employee protective conditions would have remained solely within the primary jurisdiction of the agency");  *Bhd. of Locomotive Engineers v. ICC*, 808 F.2d 1570, 1579 n.75 (D.C. Cir. 1987) ("Arbitration is a legitimate method of resolving labor disputes and does not divest the Commission of its jurisdiction.").

"Nothing in the [the Board's organic statute] either requires or forecloses the agency's use of arbitration in employee disputes, or limits agency review of arbitration decisions."  *Int'l Bhd. of Elec. Workers*, 862 F.2d at 336; *see also Employees of the Butte, Anaconda & Pac. Ry. Co. v. United States*, 938 F.2d 1009, 1013–14 (9th Cir. 1991).  The Board, accordingly, acts well within its authority, *see Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984), in opting to require arbitration before considering disputes over labor-protective conditions stemming from railroad mergers.  *See Bhd. of Locomotive Engineers*, 808 F.2d at 1579 n.75; *Int'l Bhd. of Elec. Workers*, 862 F.2d at 336.

Under what has come to be known as the *Lace Curtain* standard, the Board employs a "sliding scale of deference" in reviewing arbitration awards, *Ry. Labor Executives' Ass'n v. United States*, 987 F.2d 806, 812 (D.C. Cir. 1993), deferring to the arbitrator's findings on minor, factual disputes and exercising its own judgment over broader matters that implicate federal labor policy.  The Board customarily limits its review to "recurring or otherwise significant issues of general importance regarding the interpretation of our labor protective conditions."  *Lace Curtain*, 3 I.C.C.2d at 736; *Ry. Labor Executives' Ass'n*, 987 F.2d at 812 ("An arbitrator's interpretations of Commission regulations and views regarding transportation policy are subject to more searching review.").  Even aside from significant labor issues, however, the Board will overturn an arbitration

award "when there is egregious error, when the award fails to draw its essence from the labor protective conditions, or when the arbitrator exceeds the specific limits on his authority." *Am. Train Dispatchers Ass'n v. CSX Transp., Inc. (Arbitration Review)*, 9 I.C.C.2d 1127, 1130 (1993).

Parties may petition the federal courts of appeals for relief from an order of the Board, including from the Board's review of an arbitration award. 28 U.S.C. § 2342(5). Under the Administrative Procedure Act, a court may set aside an order of the Board if it is "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "unsupported by substantial evidence," *id.* § 706(2)(E). *See Film Transit, Inc. v. ICC*, 699 F.2d 298, 300 (6th Cir. 1983). Applying this standard, the federal courts of appeals have upheld the Board's review of numerous arbitration awards under the *Lace Curtain* standard. *See Swonger v. Surface Transp. Bd.*, 265 F.3d 1135, 1139–41 (10th Cir. 2001) (affirming a decision of the Board under *Lace Curtain*); *Augustus v. Surface Transp. Bd.*, No. 99-3014, 2000 WL 1888805, at *3–4 (6th Cir. Dec. 22, 2000) (same); *Employees of the Butte, Anaconda & Pac. Ry. Co.*, 938 F.2d at 1013–15 (9th Cir. 1991) (same); *Int'l Bhd. of Elec. Workers*, 862 F.2d at 336 (D.C. Cir. 1988) (same); *see also Canadian Pac. Ry. Co. v. Surface Transp. Bd.*, 197 F.3d 1165, 1167–68 (D.C. Cir. 1999) (reviewing the Board's application of the *Lace Curtain* standard); *United Transp. Union v. Surface Transp. Bd.*, 114 F.3d 1242, 1246–47 (D.C. Cir. 1997) (same); *United Transp. Union v. ICC*, 43 F.3d 697, 700–01 (D.C. Cir. 1995) (same); *Ry. Labor Executives' Ass'n*, 987 F.2d at 812 (D.C. Cir. 1993) (same); *Bhd. of Maint. of Way Employees v. ICC*, 920 F.2d 40, 45 (D.C. Cir. 1990) (same).

B.

The Board's decision to uphold this arbitration award survives "arbitrary and capricious" review. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983). Faced with an ambiguous provision in the labor-protective conditions, the arbitration panel properly referred to the past practice of the parties and the *New York Dock* principles in determining that Black and Sorge lost their benefits when they refused to fill vacancies in the rail system.

The ambiguity appears in Agreement H, which lies at the heart of this dispute. Because the railroad abolished, rather than transferred, petitioners' positions, Section I(2)(B) of Agreement H covers their claims. That section provides only that displaced workers will maintain their seniority at their original work site; it does not address whether such employees immediately may be transferred to a vacancy in the system without first being placed on an extra board.

To the extent other provisions of Agreement H clarify the picture, they do so in a way that favors Grand Trunk. Section I(2)(A) allows Grand Trunk to transfer an employee if the employee's position is itself transferred, regardless of whether there is another vacancy in the system. Section II(2) allows Grand Trunk to transfer an employee from an extra board to a different location if a vacancy arises within the system. These two provisions imply that Grand Trunk may transfer an employee whenever there is a vacancy in the system—an implication reinforced by Section I(1)'s statement that "the intent and purpose of this Agreement [is] to provide for expedited changes in services, facilities and operations and for the orderly transfer of protected employees, work and positions." JA 183. The transfer of employees assuredly would be more "expedited" and "orderly" if Grand Trunk could transfer soon-to-be-displaced employees without first establishing an extra board, then transferring them.

The Board also has consistently interpreted the *New York Dock* conditions to encompass the principle that railroads "are not required to make protective payments to [those] employees who are offered continued employment [elsewhere in the system], but decline to take advantage of it." *Canadian Nat'l*, 4 S.T.B. at 164; *see Norfolk & W. Ry. Co. & New York, Chicago & St. Louis R.R. Co.–Merger, etc. (Arbitration Review)*, 9 I.C.C.2d 1021, 1027 (1993) ("[E]mployees [who] exercise existing contractual rights (seniority) [must] take available work elsewhere in exchange for

economic protections that would be afforded should they ultimately be displaced."). Because the Master Agreement specifically adopted the *New York Dock* conditions, these background principles also support the arbitration panel's reading of Agreement H.

Past practice and common sense point in the same direction. If Sections I(2)(A) and II(2) of Agreement H were read as the exclusive modes of transferring an employee, then Grand Trunk would be required to put displaced employees on an extra board, at least for an instant, before forcing them to be transferred. No rational party would bargain for such a mindless formality that offers no substantive benefits for protected employees but only procedure for its own sake and its own sake alone.

No less oddly, under petitioners' own interpretation, Grand Trunk could have abolished the vacant positions in Flint, Michigan, then transferred the two carmen's positions there. Doing so would have placed Grand Trunk's actions squarely within Section I(2)(A) of Agreement H, which unquestionably allows Grand Trunk to transfer employees without first establishing an extra board.

Black and Sorge respond that "placement on an Extra Board is *automatic* under the Implementing Agreements" and that "one need not resort to interpretation of ambiguous terms to reach this conclusion." Br. at 25. They invoke a provision in the Extra Board Agreement stating that "[a]ll protected employees . . . who would otherwise stand to be furloughed as a result of a reduction in force will . . . be placed on an extra board," JA 89 (Extra Board Agreement, Section 1(a)(1)), and Section II(2) of Agreement H, which allows Grand Trunk to transfer employees already on an extra board. *See* Br. at 25–26. These passages, however, simply take the interpreter back to the central ambiguity in the case: whether employees whose positions are abolished while the system retains vacancies—employees like Black and Sorge, in other words—"would otherwise stand to be furloughed as a result of a reduction in force." The provisions of Agreement H, along with the *New York Dock* conditions, common sense and past practice, suggest that the petitioners were *not* otherwise eligible for compensated furlough: They breached their part of the bargain by rejecting available work.

Black and Sorge persist that Section 7 of the Master Agreement supports their reading of Agreement H, as it provides that employees of the Detroit and Toledo Shore Line Railroad Company "who are receiving dismissal allowances shall be obligated to accept a reasonably comparable position . . . which does not require a change in residence in order to maintain their protection hereunder." JA 83. Under petitioners' reading of the agreements, former employees of the Detroit and Toledo Shore Line Railroad Company (including Black and Sorge) are shielded from the application of Section II(2) of Agreement H because Grand Trunk could force them only to accept a position that "does not require a change in residence."

By its terms, however, the quoted language from the 1979 Master Agreement refers to employees "who *are receiving* dismissal allowances"—namely, those employees receiving dismissal allowances before the 1979 merger, not all employees who happened to be dismissed after the merger. That is the interpretation the Brotherhood of Railway Carmen has given to the provision. That interpretation is consistent with past practice, as Section 7 "has never been interpreted as limiting [Grand Trunk's] right to 'force transfer' Carmen pursuant to Agreement H," JA 14, and Black and Sorge cannot point to a single example in which it has. And that interpretation is the only one that makes sense. As we have shown, a contrary reading of the provision comes to naught because, under Agreement H of the 1981 Working Agreements, Grand Trunk could have abolished the vacant positions in Flint and transferred the petitioners' positions from Toledo to Flint. Such an action would have invoked Section I(2)(A), not Section II(2), of Agreement H, so that Black and Sorge never would have had a right to be placed on an extra board and thus never would have been shielded from transfer under Section 7 of the Master Agreement.

Black and Sorge, lastly, argue that "*Lace Curtain* should not preclude this Court from reviewing the arbitral award (as well as the [Board] decision) in the instant case and its inquiry should not be limited to whether the [Board] acted arbitrarily and capriciously in its application of the *Lace Curtain* standard." Br. at 18. Fearing that the Board might "finess[e] the litigant out of its statutory right to judicial review," Br. at 19 (internal quotation marks omitted), they question whether the "resulting layers of deference unlawfully place the arbitration result beyond judicial review," Br. at 18; *see Union Pac. R.R. Co. v. Surface Transp. Bd.*, 358 F.3d 31, 35 (D.C. Cir. 2004), and therefore request that we "directly review the arbitrator's decisions" under the *Steelworkers Trilogy* test, Br. at 19; *see Ass'n of Am. R.Rs. v. Surface Transp. Bd.*, 162 F.3d 101, 112 (D.C. Cir. 1998) (Sentelle, J., concurring in part and dissenting in part).

It is useful to place this contention in the context of what the two carmen have not argued. They have not challenged the Board's authority to impose binding arbitration upon parties faced with disagreements about the meaning of a labor-protective condition. And they have not challenged the Board's decision to review arbitration awards under the *Lace Curtain* standard. As other courts have noted, there may be grounds for second-guessing either one of these decisions of the Board. *Cf. Ass'n of Am. R.Rs.*, 162 F.3d at 111–12 (Sentelle, J., concurring in part and dissenting in part) (noting that "when Congress has specifically vested an agency with the authority to administer a statute, it may not shift that responsibility to a private actor," but affirming the Board's delegation because "[c]ircuit precedent binds us unless and until it is overruled") (internal quotation marks omitted); *Union Pac. R.R. Co.*, 358 F.3d at 35 ("[A]lthough this court has repeatedly rejected claims that the Board's *Lace Curtain* standard of review is too *broad* in scope . . . we have never before addressed the argument that the standard is too *narrow*."). The carmen, however, have not raised either argument here. Nor could they at this late stage in the case: They requested arbitration after their union refused to represent them, maintained that the arbitration panel had jurisdiction over their claims and submitted that the Board should review the arbitration award without questioning the *Lace Curtain* standard.

What this background leaves us with is the contention that arbitrary-and-capricious review of the Board's order may require us to affirm an arbitration award that we otherwise would strike down if we could review the award directly. Only a small subset of cases, it would appear, could be affected by this interposition of agency review. For as deferential as the arbitrary and capricious standard may be, judicial review is not non-existent. This standard still requires courts of appeals to vacate a Board order that "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

That leaves petitioners concerned about a case in which the Board properly considered every important aspect of the award and offered a reasoned explanation for it but in which the arbitrator nonetheless was not even "arguably construing or applying" the labor agreement. *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001); *Mich. Family Res., Inc. v. Serv. Employees Int'l Union Local 517M*, ___ F.3d ___, No. 04-2564, 2007 WL 188099, at *5–6 (6th Cir. 2007) (en banc). While such cases may indeed exist, this is not one of them, and this case accordingly does not require us to venture into deciding the question, one that no court has squarely faced. *See, e.g.*, *Union Pac. R.R. Co.*, 358 F.3d at 36 ("[W]e leave to another day the question of whether litigants are entitled to direct judicial review of such arbitration decisions."). It suffices for resolving this dispute that petitioners' standard-of-review concerns are of no moment here. As we have shown, the Board's order readily survives "arbitrary and capricious" review under *State Farm*. And even if we were required to review the arbitration award directly, it would survive scrutiny under the *Steelworkers Trilogy* because it rationally construes the relevant labor agreements.

III.

For these reasons, we deny the petition for review.